[No. 19759-2-I. Division One. August 14, 1989.]

THE STATE OF WASHINGTON, *Respondent,* v. JERRY J. JEPPESEN, *Appellant.*

*Anna–Mari Sarkanen* of *Washington Appellate Defender Association,* for appellant.

*Seth R. Dawson, Prosecuting Attorney,* and *Alfred P. Gehri* and *Seth Aaron Fine, Deputies,* for respondent.

SWANSON, J.—Jerry J. Jeppesen appeals from an order committing him to Western State Hospital for observation and treatment pursuant to RCW 10.77.110. A jury found Jeppesen not guilty by reason of insanity of two counts of

first degree assault. Jeppesen contends that the trial court erred by refusing to bifurcate the proceedings.

Appellant Jeppesen was charged by information with one count of attempted first degree murder (count 1), two counts of first degree assault (counts 2 and 3), and attempting to elude a pursuing police vehicle (count 4). Following initial determinations of incompetency, Jeppesen was found competent to stand trial. He eventually entered pleas of not guilty and not guilty by reason of insanity. Prior to trial, counsel for Jeppesen moved to bifurcate the proceedings into "guilt" and "insanity" phases. Counsel contended that Jeppesen's claims of self–defense and insanity were inherently contradictory and required him to argue simultaneously that the defendant was both a reasonable person and insane. Counsel further maintained that the jury's consideration of future dangerousness for purposes of RCW 10.77.040 required the admission of character evidence that generally would be excluded pursuant to ER 403, 404, and 609 in a trial without the insanity issue. The trial court denied the motion, concluding that the jury was capable of properly distinguishing the issues, and the case proceeded to trial.

The charges arose from an incident that began on October 1, 1985, when Richard Johnson, a Snohomish County deputy sheriff, stopped Jeppesen's vehicle in south Everett for expired license tabs. After exiting his marked patrol car, Johnson walked up to Jeppesen's car, informed Jeppesen that he had been stopped because of an expired license tab, and requested Jeppesen's driver's license. Jeppesen replied that he did not have a driver's license and that driver's licenses were unconstitutional, and directed Deputy Johnson to send him the citation by mail. Jeppesen then drove away, proceeding southbound on I–5.

Deputy Johnson and police units from several jurisdictions chased Jeppesen southbound on I–5 through Snohomish County and into King County, unsuccessfully attempting to box Jeppesen's vehicle in with patrol cars. During the course of the chase, Jeppesen fired a series of

shots at his pursuers from a revolver and rifle, wounding one officer. Jeppesen was eventually captured following a gun battle near the 65th Street N.E. overpass in Seattle.

At trial, Jeppesen admitted committing the charged acts, but claimed that he acted in self–defense. Jeppesen explained that he was a member of an ultra–secret organization known as the "Ums,"[1] a group dedicated to preventing the antagonistic Rothschild and Rockefeller families from starting World War III.[2] In the week prior to October 1, Jeppesen was repeatedly warned in a series of coded messages that the Russians "were out to nail me" because of his familiarity with a new class of gigantic amphibious troop–carrying Russian submarine as well as his knowledge of particle beam technology. Jeppesen was informed that the Russians most likely would bribe several police officers to kidnap him; the officers would immobilize him with a stun gun and place him on a plane to Russia, where he would then be tortured.[3] Jeppesen asserted that it was not wrong to shoot at the police because he had the right to defend himself.

---

[1]Jeppesen's organization does not have a real name. The designation "Ums" arose following an incident in a sporting goods store. After purchasing clay pigeons, Jeppesen overhead two men, who had obviously been observing him, say to one another, "'Yeah. His name's Jeppesen. He's one of 'em.' So I must be Um, because I'm one of 'em. That's how we became known as the Ums." Report of Proceedings, at 348.

[2]According to Jeppesen, the Rothschilds, also known as the "illuminati," control the United States, Canada, England, Europe, and assorted allies; the Rockefellers control Russia, China, portions of Southeast Asia, and "a fair amount" of South America.

[3]Jeppesen communicates with other Ums through various means. On some occasions, Jeppesen talks "half-way" in code to an unsuspecting non–Um. Ums located up to 15 miles away are able to eavesdrop on the conversation with parabolic microphones and will respond by projecting laser-guided messages onto buildings located behind the person to whom Jeppesen is talking. On other occasions, Jeppesen will speak in code while driving in his car; the particular code chosen will depend on the color of a laser beam projected by the Ums onto his windshield.

Jeppesen explained that his strategy in fleeing from the Snohomish County officers was twofold. First, he hoped to reach the relative safety of the Roxbury police station in King County, since the Russians "aren't going to hire the whole police department or pay the whole police department off . . ." Report of Proceedings, at 387. In the alternative, Jeppesen fired shots at his pursuers, hoping to force them to fire back and wound him severely enough to require hospitalization rather than kidnapping. Jeppesen reasoned that the Russian agents would not "get paid for supplying a dead corpse." Report of Proceedings, at 396.

In addition to Jeppesen's testimony, the defense presented testimony by two clinical psychologists, Dr. Kenneth Muscatel and Dr. Fred Wise. Dr. Muscatel and Dr. Wise agreed that Jeppesen was motivated by a genuine belief that the pursuing police officers were Russian agents. The two also agreed that Jeppesen suffered from paranoid schizophrenia and that he met the test for legal insanity on October 1, 1985. During cross examination, both psychologists opined that Jeppesen was dangerous to society and required further treatment.

At the close of the defendant's case, the trial court dismissed the attempted first degree murder charge (count 1). After being instructed on theories of self–defense and insanity, the jury acquitted Jeppesen of the attempting to elude charge (count 4). By special verdict, the jury found that Jeppesen had committed the acts charged as first degree assault (counts 2 and 3) but that he was not guilty by reason of insanity. The jury further found that Jeppesen presented a "substantial danger" to other persons, that there was a substantial likelihood that he would commit further felonious acts jeopardizing the public safety, and that Jeppesen should not be placed in treatment less restrictive than detention in a state mental hospital. Following denial of a motion for a new trial or arrest of judgment, Jeppesen was committed to Western State Hospital for observation and treatment for a maximum term of life.

The sole issue on appeal is the propriety of the trial court's refusal to bifurcate the proceedings into "guilt" and "insanity" phases.[4] Federal due process principles do not require a bifurcated trial when a defendant voluntarily asserts both a defense on the merits and the absence of criminal responsibility due to insanity. *See, e.g., Vardas v. Estelle,* 715 F.2d 206 (5th Cir. 1983), *cert. denied,* 465 U.S. 1104 (1984); *Gilreath v. Robinson,* 544 F. Supp. 569 (E.D. Va. 1982) (Fourteenth Amendment does not guarantee accused a separate audience for each defense that might be devised), *aff'd sub nom. Gilreath v. Mitchell,* 705 F.2d 109 (4th Cir. 1983); *see generally* Annot., *Necessity or Propriety of Bifurcated Criminal Trial on Issue of Insanity Defense,* 1 A.L.R.4th 884 (1980). Each state is therefore free to regulate the issue. *Gilreath v. Robinson, supra.*

■ A few states, either by statute or judicial fiat, prescribe bifurcation under certain circumstances when a defendant raises an insanity defense. In the majority of states, however, including Washington, the trial court has discretion to order a bifurcated trial or impose other protective procedures. *See State v. Jones,* 32 Wn. App. 359, 369, 647 P.2d 1039 (1982), *rev'd on other grounds,* 99 Wn.2d 735, 664 P.2d 1216 (1983); *cf. State v. Lover,* 41 Wn. App. 685, 707 P.2d 1351 (1985) (trial court did not err in refusing bifurcation when defendant failed to enter dual pleas); *see also* Annot., *supra* § 3. Consequently, we will not disturb the trial court's decision here absent an abuse of discretion.

■ The potential need for bifurcation or some other protective procedure when the issue of insanity is tried simultaneously with guilt on the merits is well recognized:

> The former requires testimony that the crime charged was the product of the accused's mental illness. Ordinarily, this testimony will tend to make the jury believe that he did the act. Also, evidence of past anti-social behavior and present anti-

---

[4]"Guilt" phase refers to "that phase of a bifurcated trial in which the jury decides whether the defendant has done the act charged and has no 'noninsanity' defenses." *State v. Jones,* 99 Wn.2d 735, 739 n.1, 664 P.2d 1216 (1983).

social propensities, which tend to support a defense of insanity, is highly prejudicial with respect to other defenses. Moreover, evidence that the defendant has a dangerous mental illness invites the jury to resolve doubts concerning commission of the act by finding him not guilty by reason of insanity, instead of acquitting him, so as to assure his confinement in a mental hospital.

(Footnote omitted.) *Holmes v. United States,* 363 F.2d 281, 282 (D.C. Cir. 1966). In assessing whether bifurcation is warranted in an individual case, courts in other jurisdictions have utilized the following 2–prong analysis:

When deciding whether a defendant's motion for bifurcation should be granted, the trial court must first examine both the defendant's insanity defense and his defense on the merits to determine whether they are bona fide defenses supported by the facts and the law. If either defense is found lacking, bifurcation should be refused. If, however, both defenses are substantial, the court must then determine the likelihood of prejudice to the defendant which may result if both defenses are presented at a unitary trial.

*State v. Boyd,* 167 W. Va. 385, 391, 280 S.E.2d 669, 675–76 (1981). We find this approach persuasive and in accord with the trial court's decision here.

For purposes of the 2–prong bifurcation analysis, each defense must be "substantial" and supported by a "proffer of evidence sufficient in quality and quantity to enable the court to rule intelligently on the issue." *State v. Boyd, supra* at 391. A defendant does not raise a "substantial defense" for purposes of bifurcation when he or she merely puts the State to its burden of proof or offers nothing beyond a bare denial. *See, e.g., Harried v. United States,* 389 F.2d 281 (D.C. Cir. 1967); *State v. Bragg,* 160 W. Va. 455, 235 S.E.2d 466 (1977); *see generally* Annot., *supra* § 7. Similarly, a defendant's expectation that the State's evidence will be deemed inadmissible does not constitute a substantial defense on the merits. *State v. Boyd, supra.* Cases in which a defendant has been found to raise both a substantial defense on the merits and a substantial insanity defense differ significantly from the circumstances present here. *See, e.g., Houston v. State,* 602 P.2d 784 (Alaska 1979) (defendant who raised substantial self–defense and

insanity claims was prejudiced by denial of bifurcated trial when defense psychiatrist testified that he did not believe self–defense claim); *cf. United States v. Ashe,* 427 F.2d 626 (D.C. Cir. 1970) (evidence raised substantial doubt that defendant committed charged act).

 Appellant argues that he raised a substantial claim of self–defense based on evidence that he genuinely believed he was being pursued by Russian agents. As appellant notes, the jury was properly instructed that it was to evaluate Jeppesen's contentions "by the conditions as they appeared to him at the time, not by conditions as they might now appear to the jury in light of the testimony before it." Clerk's Papers, at 49; *see also State v. Wanrow,* 88 Wn.2d 221, 559 P.2d 548 (1977). However, the actor's subjective belief in the need for self–defense must nonetheless be objectively reasonable. *See State v. Hatley,* 41 Wn. App. 789, 798, 706 P.2d 1083, *review denied,* 104 Wn.2d 1024 (1985). That is, the defendant must have acted as a "reasonably and ordinarily cautious and prudent [person] would have done under the circumstances as they appeared to [him]." *State v. Adams,* 31 Wn. App. 393, 396, 641 P.2d 1207 (1982) (quoting *State v. Tyree,* 143 Wash. 313, 317, 255 P. 382 (1927)). Washington law does not decrease criminal culpability when someone acts in an honest but unreasonable belief in the necessity of force. *State v. Hughes,* 106 Wn.2d 176, 721 P.2d 902 (1986) (declining to adopt doctrine of "imperfect" self–defense).

Under the unique circumstances of this case, the attempt to conceptualize whether a "reasonably and ordinarily cautious" person would have reacted to the same perceived threat as did appellant strains the principles of self–defense beyond their logical limits. Nonetheless, we hold that the belief that one is being pursued by Russian agents disguised as Snohomish County police officers performing a routine traffic stop, however heartfelt and subjectively genuine, does not constitute a substantial defense on the merits for purposes of determining the necessity of bifurcation. Even *if* conditions are viewed as they appeared to the

appellant, his fear of the police cannot conceivably be regarded as reasonable. Consequently, because Jeppesen failed to raise a substantial defense on the merits, the trial court did not abuse its discretion by denying appellant's motion to bifurcate the proceedings.

In addition, even if we assume that Jeppesen raised a substantial defense for purposes of the bifurcation analysis, we conclude that he was not prejudiced by the unitary trial. Once the trial court concludes that the defendant has raised a substantial defense on the merits and a substantial insanity claim, the trial court must then identify the specific nature of the potential antagonism between the two defenses. *State v. Boyd, supra.* If the evidence of mental illness is such as to invite the jury to resolve doubts about the defendant's defense on the merits by finding him not guilty by reason of insanity rather than acquitting him, bifurcation may be appropriate. *State v. Boyd, supra.*

Jeppesen maintains that he was prejudiced by the admission of psychiatric evidence pertaining to insanity, including opinions regarding his future dangerousness and past similar acts, evidence that would have been excluded from the guilt phase of a bifurcated trial. The admission of such evidence in conjunction with his self–defense claim, Jeppesen reasons, either confused the jury or impermissibly influenced the jury to find him insane where they might otherwise have acquitted him completely.

Jeppesen's assertion of prejudice rests on our Supreme Court's opinion in *State v. Jones,* 99 Wn.2d 735, 664 P.2d 1216 (1983). In *Jones,* the defendant was charged with second degree assault of a plainclothes campus police officer. The defendant pleaded not guilty and claimed that his actions were taken in self–defense. However, because the defendant related "a rather unusual story about fearing for his life and planning to seek political asylum in Canada," the trial court ordered a competency hearing. *Jones,* at 738–39. Evidence presented at the hearing tended to establish that the defendant was competent to stand trial but was insane at the time of the assault. The trial court, over

the defendant's objections, then entered a not guilty by reason of insanity plea and appointed separate counsel to argue the issue. The defendant's motion to bifurcate the trial was denied, and the case was submitted to the jury on theories of self–defense and insanity. The jury found Jones not guilty by reason of insanity.

On review, our Supreme Court held that the trial court had committed reversible error by entering the NGI plea sua sponte over the defendant's objections and without inquiry into whether the defendant's desire to forgo an NGI plea was intelligent and voluntary. In rejecting the State's contention that Jones had not been prejudiced by the joint trial on guilt and insanity, the *Jones* court discussed, in broad terms, the prejudice resulting from the trial court's decision not to bifurcate the trial, an analysis that appellant seeks to apply to the instant case. *See Jones,* at 748.

*Jones,* however, differs fundamentally from the instant case. The focus of the *Jones* decision was the trial court's entry of the NGI plea over the defendant's strenuous objections. Consequently, the court's discussion of the possible prejudice of a unitary trial must be restricted to this specific context, in which "a court may rarely, if ever, take such action . . ." *Jones,* at 737. For a variety of reasons, including the evidentiary consequences that flow from an NGI defense, the *Jones* analysis cannot be transplanted wholesale to the circumstances here, where the defendant, for tactical reasons, *voluntarily* raises potentially inconsistent defenses.

In addition, appellant's argument further assumes that evidence of his insanity could have been excised in some meaningful fashion from his self–defense claim. Appellant appears to suggest that in a bifurcated trial the jury would have been required to assess his demeanor and credibility, as well as the reasonableness of his response to a routine traffic stop, in complete ignorance of his mental state. We disagree. *Cf. State v. Froehlich,* 96 Wn.2d 301, 635 P.2d 127 (1981). Under the facts of this case, appellant's defense on the merits was inextricably rooted in his

insanity defense. Given the inseparable nature of the evidence, the illogical sanitization proposed by appellant would have frustrated, not furthered, the truth–seeking process. *Cf. Jones,* at 754–55 (Dimmick, J., dissenting). We find no possibility that the appellant was unfairly prejudiced by the unitary trial.[5]

In summary, the trial court did not abuse its discretion in refusing to bifurcate the proceedings. We agree with the trial court that the jury was capable of distinguishing properly Jeppesen's claims of self–defense and insanity.

Judgment affirmed.

COLEMAN, C.J., and GROSSE, J., concur.

Review denied at 113 Wn.2d 1024 (1989).

---

[5]Appellant refers to several juror affidavits that were submitted in support of his motion for a new trial. The affidavits reveal some confusion about the instructions as they pertain to self–defense and insanity. However, the affidavits reflect the jurors' thought processes and therefore inhere in the verdict. *State v. McKenzie,* 56 Wn.2d 897, 900, 355 P.2d 834 (1960). No error has been assigned to the jury instructions.