[No. 31847-4-II. Division Two. June 1, 2006.]

THE STATE OF WASHINGTON, *Respondent*, v. KURTIS WILLIAM MONSCHKE, *Appellant*.

314

318

*Rita J. Griffith*, for appellant.

*Gerald A. Horne, Prosecuting Attorney*, and *Kathleen Proctor, Deputy*, for respondent.

¶1 QUINN-BRINTNALL, C.J. — Kurtis Monschke appeals his conviction for aggravated first degree murder. The evidence presented at trial established that Monschke murdered a homeless man to advance his status as a white supremacist. Monschke raises numerous issues in this appeal,

including challenges to the constitutionality of RCW 10-.95.020(6), the sufficiency of the evidence, the court's refusal to bifurcate the trial, and the court's order requiring him to wear a stun belt at trial. We affirm.[1]

## FACTS

¶2 Early on the morning of March 23, 2003, Terry Hawkins and Cindy Pitman observed a group of "[s]kinheads" kicking and using baseball bats to hit what appeared to be the Tacoma railroad track. 22 Report of Proceedings (RP) at 1078. The individuals were hollering and appeared drunk. Hawkins and Pitman were homeless and lived in a camp under Interstate 705 near the train tracks and the Tacoma Dome. Hawkins told police that he saw three men and a woman kicking dirt and hitting at the ground; at trial, he testified that he saw two men swinging bats, a woman kicking, and a third man standing four feet away. Pitman told police and later testified that she saw three men with shaved heads swinging and kicking but did not see a woman.

¶3 Hawkins and Pitman watched for approximately 10 minutes before turning around and walking away. They headed up a trail, but when the commotion stopped, they decided to go back toward the train tracks and their camp. On their way to the campsite, Hawkins and Pitman passed the people involved in the commotion: a man and woman snuggled together with two men following behind. The four headed up the trail and appeared "scared," like "[t]hey were trying to get away from there." 23 RP at 1218.

¶4 As Hawkins and Pitman approached the tracks where the commotion had been, they heard a strange gurgling sound. They discovered the badly beaten and bloody body of Randy Townsend, lying on his back with his head slumped over the train track. Hawkins and Pitman knew Townsend as a white acquaintance who camped

---

[1] We address Monschke's additional assignments of error in the unpublished portion of this opinion. Our resolution of those issues does not alter the result.

nearby, but Townsend was so disfigured that neither Hawkins nor Pitman immediately recognized him. Hawkins and Pitman ran to get aid and call the police. As they returned to Townsend, Hawkins and Pitman saw the four individuals involved in Townsend's assault driving away in a "blue Datsan [sic] beater." 27 RP at 1769.

¶5 Townsend never regained consciousness and died after 20 days on life support. The medical examiner determined the cause of death as blunt force trauma to the head, with at least 19 points of impact. Townsend's facial bones were broken and his face had separated from his skull. One of the blows caused a large subdural hematoma on the back side of his skull. This wound was consistent with his head having been forcefully stomped on while he was lying face down on the train track.

¶6 During the investigation that followed, officers found hate-based graffiti near the murder scene. The graffiti included swastikas, lightning bolts in the shape of "SS," "White Power Skinheads," "U Suck Wiggers," "El Spic," "Skinhead white to the bone," "Die SHARPS," "Die Junky Die," "El Nigger," "Tacoma Skinhead Movement," "die niggers," "Heil Hitler," and "Fuck All Drug Addicts."[2] 21 RP at 940; 26 RP at 112, 116, 118-19, 121-22. Homeless people in the area told police that the graffiti began appearing a couple of weeks before Townsend's murder.

¶7 Officers also talked to Mertis Mathes and Amy Gingrich, a homeless couple living in a camp two blocks from the murder scene. Mathes is black and Gingrich is white. Mathes and Gingrich told officers they woke early on the night of the murder when three loud men approached their camp. Gingrich recognized one of the men from a casual encounter a couple weeks earlier. The men had shaved heads, appeared drunk, and were carrying baseball bats. Mathes asked what the men wanted. One responded,

---

[2] A pair of lightning bolts in the shape of "SS" is a neo-Nazi symbol. "Wigger" is a disparaging term used to describe white individuals who associate with minorities. "SHARPS" is an acronym for the white supremacist group Skinheads Against Racial Prejudice. "Spic" is a disparaging term used to describe a person of Latin American descent.

"we plan on doing a nigger like you." 21 RP at 956. When Mathes grabbed his machete, the three men walked away.

¶8 Officers linked the crime scene graffiti to a reported incident of graffiti at an apartment building two blocks from the murder scene. Scotty Butters, Tristain Frye, and David Pillatos had been evicted from the Rich Haven Apartments for yelling racial slurs at passersby, for painting swastikas and "Fuck all niggers" on the building, and for Butters's sale of imitation cocaine to a drug addict. 26 RP at 147. Butters, Frye, and Pillatos matched Hawkins's and Pitman's descriptions of Townsend's assailants.

¶9 Frye and Pillatos lived with Monschke. Frye and Pillatos were in a relationship and Frye was three months' pregnant. A car matching the one Hawkins and Pitman described was parked outside Monschke's apartment. Officers went to the apartment to discuss an unrelated incident with Pillatos, and he invited them inside. In Monschke's apartment, officers saw Nazi and white supremacist paraphernalia. They also noticed cigarette packages and empty beer bottles of the same brand found at the crime scene. Pillatos freely told the officers that he and Monschke were white supremacists.

¶10 The State charged Monschke, Butters, Frye, and Pillatos with premeditated first degree murder under RCW 9A.32.030 and alleged that the murder was aggravated under RCW 10.95.020(6) because Townsend was murdered so that the defendants could obtain or maintain their membership or advance their position in the hierarchy of an organization or identifiable group, namely, "white supremacists." 1 Clerk's Papers (CP) at 84. Under a plea bargain, Butters and Pillatos pleaded guilty to first degree murder and Frye pleaded guilty to second degree murder. Each agreed to testify at Monschke's trial.

¶11 Prior to the plea agreements, the defendants appeared at a pretrial hearing where they were separated for security purposes. Each wore leg shackles and a belly chain with arm restraints. At some point, Butters and Pillatos began spitting and cursing at each other. As they were

being subdued, Monschke stood up and started yelling at Pillatos, calling him a "fucking spic." 5 CP at 431; *see* note 2, *supra*. Monschke then grabbed a chair and attempted to throw it at Pillatos. Monschke was subdued and taken from the courtroom spitting and resisting.

¶12 After the altercation and after the plea agreements, the trial court held a hearing on a State motion to have Monschke wear a stun belt. At the hearing, the court heard testimony from Sergeant Sabrina Braswell of the Pierce County Department of Corrections. Sergeant Braswell testified that Monschke had been wearing a stun belt on his waist to every court proceeding since the altercation. She also testified that without the belt, Monschke was highly disruptive in the jail. Monschke had possessed makeshift weapons on several occasions, and he routinely antagonized other inmates by, among other things, throwing feces at them. Sergeant Braswell testified that without restraints, she would have to instruct her officers to essentially "sit[ ]on top" of Monschke to ensure courtroom safety. 14 RP at 594.

¶13 Based on this testimony and its own observations of Monschke's courtroom conduct, the court ordered that Monschke be required to wear a stun belt during trial. The court concluded that the stun belt was necessary because the trial would become intense and Monschke had shown a pattern of misbehavior when not controlled. The court left it to the jail staff to determine whether to use a waist or ankle belt. Sergeant Braswell had testified that inmates often preferred the waist belt over the ankle belt. The court stated that it had not noticed Monschke wearing the waist belt but instructed defense counsel to raise any visibility issues if they arose.

¶14 Monschke moved to bifurcate his trial into a first degree murder phase and an aggravating circumstance phase, arguing that bifurcation was necessary to keep the jury from considering his white supremacist beliefs when deliberating on the first degree murder elements. The court denied the motion, concluding that evidence of Monschke's

white supremacist affiliations was admissible in the trial on the merits of the first degree murder charge to prove motive and intent.

¶15 Frye testified at trial that on the evening of March 22, 2003, Pillatos brought up the subject of taking Frye out to earn her "red [shoe]laces." 30 RP at 2330. According to Frye, red shoelaces symbolized that the wearer had assaulted a member of a minority group; Butters, Monschke, and Pillatos each wore red shoelaces. Pillatos encouraged Butters and Monschke to take Frye out; the three men had discussed the idea two or three times before. After the discussion, the four drove to a grocery store to buy beer. The three men also purchased two baseball bats. They did not discuss the reason for the bats, but, according to Frye, it was understood that "they weren't going to be used for baseball." 31 RP at 2485.

¶16 The four then drove to the Tacoma Dome. Butters expressed a desire to go to a different part of the city to "beat up some niggers," but Frye and Pillatos wanted to show Monschke graffiti they had recently painted nearby. 30 RP at 2333. As they walked underneath Interstate 705, Frye separated from the group. She sat down and Townsend approached her. Townsend asked for a cigarette and a beer and the two talked for awhile.

¶17 Townsend finished his cigarette and had begun to walk away when Butters and Pillatos confronted him. Butters said something to Townsend and then struck him in the head with the bat. The blow shattered the bat and sent Townsend to the ground. Butters and Pillatos then began kicking Townsend in the head. Pillatos picked up a large rock, later determined to weigh 38 pounds, and threw it on Townsend's face. Butters and Pillatos carried Townsend to the train tracks and placed him on his stomach with his head lying face down on the track. Butters then stomped on the back of Townsend's head. Although Townsend was still breathing, Butters exclaimed, "I killed that guy." 30 RP at 2346. Butters and Pillatos went to find Monschke.

¶18 Monschke was carrying the second bat when the three men returned to where Townsend lay. Monschke walked up to Townsend and began hitting him in the head with the bat. Monschke struck 10 to 15 blows while Butters continued to kick Townsend's head. Butters repeatedly called Townsend "a piece of shit." 30 RP at 2349. Pillatos told Frye to kick Townsend. According to Frye, she initially refused but Pillatos covered her eyes and led her to Townsend. Frye then kicked Townsend's head four times. As the group left, Monschke stated, "I wonder if God gives us little brownie points for this." 31 RP at 2369.

¶19 When the four returned to Monschke's apartment, Monschke and Pillatos gathered up the clothing worn during the attack and left to burn it. Later, Butters told Frye, "Don't feel sorry for that piece of shit. He wasn't white." 31 RP at 2374. Butters excitedly told Frye that she had earned her red laces and he had earned his "bolts." 31 RP at 2375. At trial, the State presented evidence that between the time of his arrest and his testimony at trial, Butters had obtained an "SS" lightning bolt tattoo. *See* note 2, *supra.*

¶20 Butters, Pillatos, and Monschke also testified; their testimony differed from each other's and from Frye's in certain respects. Pillatos testified that Monschke hit Townsend in the head with the bat three or four times. Monschke and Butters testified that Monschke was somewhere else during the entire assault and that he used the bat afterwards simply to nudge Townsend to see if he was still alive. Butters also testified that he told officers that Monschke hit Townsend 10 or more times.

¶21 Although all three men denied that Townsend's death was premeditated or that it had anything to do with earning red shoelaces, Butters and Pillatos offered contradictory testimony. Like Frye, Butters testified that on the night of the murder there was a discussion about Frye earning her red shoelaces. According to Butters, red shoelaces reflected that one was willing to shed blood, not necessarily that one had done so; Butters had earned his

red shoelaces on more than one occasion by doing something physical. Butters testified that after the attack, Frye said, "This means my baby gets to wear red laces, too." 30 RP at 2293. In addition, Pillatos testified that Townsend "got beat up" because he was a drug addict and a "parasite." 29 RP at 2106.

¶22 Jennifer Stiffler, who dated Monschke from September 2002 to March 2003, testified that Monschke was a very active white supremacist: he was a member of Volksfront and often talked about moving up in the group and starting a Tacoma chapter; he took Stiffler to a meeting for National Alliance; he decorated his home with white supremacist and Nazi memorabilia, including a flag for National Alliance; he listened to racist music; he frequently passed out fliers from several groups; and he obtained Nazi and white supremacist tattoos. According to Stiffler, Monschke and Pillatos repeatedly watched the movie *American History X* (New Line Productions 1998), which includes a "curb stomp" scene that Monschke particularly enjoyed. In that scene, the main character, a white supremacist, shoots a black man and then stomps on the back of his head while the man is forced to bite a street curb.

¶23 Stiffler further testified that Monschke would wear white or red suspenders and red shoelaces whenever he went out with friends. Monschke told Stiffler that white suspenders symbolized "white pride" and that red shoelaces and suspenders "means you've beaten up somebody." 32 RP at 2602. Stiffler testified that she overheard Monschke several times talking to Frye about earning her red shoelaces. Stiffler also testified that Monschke had told her that he hated drug addicts.

¶24 The State presented evidence of white supremacist paraphernalia police found during their investigation. The items found in Monschke's apartment included a National Alliance flier; pamphlets entitled *"Martin Luther King Jr. was a fraud," "What is Holocaust Denial,"* and *"Inside the*

*Auschwitz Gas Chambers*";[3] and a business card listing a web site and reading "Sick of wiggers? So are we. Check us out."[4] The items found in a storage unit Pillatos rented included applications filled out by Pillatos and Frye to join the Aryan Nations; photos showing that Monschke had tattoos identical to the main character in *American History X*; and a photo of Monschke giving a Nazi salute.

¶25 The State also presented evidence of white supremacist paraphernalia found in Brian Zauber's home. At the time of his arrest, Monschke was living with Zauber,[5] the local leader for National Alliance. Officers saw a hanging flag matching one that had been seen in Monschke's apartment. They also found the following items: *The Turners Diaries*,[6] a book commonly referred to as "the bible for the white supremacist movement";[7] a National Alliance membership card and an order form for National Alliance books and pamphlets; a "White Aryan Resistance" newspaper;[8] and an envelope with the names "Randall Townsend" and "Kurtis Monschke" written on it.[9] Officers found the following in a bag belonging to Monschke: a National Alliance handbook and membership list; a photo album of white supremacist activities; and a flag with "SS" shaped lightning bolts. *See* note 2, *supra*.

¶26 The State and Monschke each presented expert testimony on the subject of white supremacy. The State called Mark Pitcavage, the director of fact-finding for the Anti-Defamation League (ADL). Pitcavage had studied white supremacy for several years and supervised the ADL's monitoring and research of extremist groups. Pitcavage testified

---

[3] 27 RP at 1789.

[4] 27 RP at 1793-94; *see* note 2, *supra*.

[5] Monschke was evicted from his apartment in the period between the attack and his arrest.

[6] Andrew MacDonald, The Turners Diaries (2d ed. 1996).

[7] 28 RP at 1920.

[8] 28 RP at 1923.

[9] 28 RP at 1922.

that white supremacists could be identified by a shared ideology summed up in the following mission statement known as "The 14 Words": "We must secure the existence of our race and a future for white children." 25 RP at 1598. Pitcavage opined that this ideology fostered so many shared similarities, beliefs, and customs that white supremacists could be considered a "group" within the common meaning of the term.

¶27 Pitcavage considered white supremacists to be a "group" even though they were not well organized, did not have one overarching structure, had many subgroups, and were split over the advocacy and use of violence. Pitcavage explained that the subgroups were nonexclusive; routinely overlapping; and often loosely organized to prevent police infiltration, to limit legal liability, and to maintain a certain level of personal anonymity. Pitcavage testified to an organized "hierarchal structure" "in terms of status, where someone who's perceived to be really standing up for the white race, really being a white warrior, gets more result of status, gets more respect." 25 RP at 1635. In addition, Pitcavage testified that many subgroups internally advocated violence but publicly professed nonviolence so as to avoid lawsuits of the sort that had disbanded earlier white supremacy groups.

¶28 Monschke called Randy Blazak, a college professor whose research focused on hate crimes. Blazak opined that white supremacists were not an "identifiable group." Blazak agreed with Pitcavage that white supremacists shared an ideology captured by "The 14 Words," but he testified that in his opinion there was too much conflict within the movement to consider white supremacists a cohesive group. These conflicts included disagreement over the need for an organized hierarchy, the use of violence, the role of religion, and defining who was "white."

¶29 Blazak also testified about Volksfront and National Alliance. According to Blazak, National Alliance was a highly violent subgroup of white supremacists. Blazak testified that a member could gain status in National

Alliance for murdering someone deemed inferior. Blazak described Volksfront as a very secretive organization with a "public front" of nonviolence, but he noted that "there may be other things that go on behind closed doors." 34 RP at 2911. Blazak also testified that Volksfront had an organizational hierarchy. According to Blazak, Volksfront and National Alliance had over the last several years been partnering and connecting.

¶30 The State presented evidence that Volksfront maintained a prisoners of war (POW) list on its web site. The list included the contact information for members of the white supremacy movement that had committed hate crimes and were currently incarcerated. Several individuals on the list had committed "very violent" crimes. 33 RP at 2696. The State also presented evidence that Monschke left messages on Volksfront's web site and that he went by the screen name "SHARPshooter." 33 RP at 2686. *See* note 2, *supra*.

¶31 A jury found Monschke guilty as charged and the court sentenced him to serve a mandatory life sentence without possibility of early release under RCW 10.95.030(1). This appeal followed.

## ANALYSIS

Aggravating Circumstance and RCW 10.95.020(6)

¶32 The jury found that Monschke's first degree murder conviction was aggravated because the murder was committed "to obtain or maintain his membership or to advance his position in the hierarchy of an organization, association, or identifiable group." 3 CP at 387. This aggravating circumstance is set forth at RCW 10.95.020(6). Monschke challenges the aggravating circumstance and maintains that (1) white supremacy is not an "identifiable group" with a "hierarchy"; (2) RCW 10.95.020(6) is overbroad in that it punishes people merely for having "unpopular opinions about the superiority of the white race";[10] and (3) the term

---

[10] Br. of Appellant at 43.

"group" is unconstitutionally vague as applied to him. We disagree with each of these contentions.

DOES WHITE SUPREMACY FALL WITHIN THE MEANING OF RCW 10.95.020(6)?

¶33 Interpretation of a statute is a question of law reviewed de novo. *State v. Thompson*, 151 Wn.2d 793, 801, 92 P.3d 228 (2004). The fundamental objective of statutory interpretation is to ascertain and give effect to the legislature's intent. *Thompson*, 151 Wn.2d at 801. We give effect to plain and unambiguous statutory language as a clear expression of legislative intent. *Thompson*, 151 Wn.2d at 801. If an unambiguous term is not statutorily defined, we define it by its dictionary meaning. *State v. Fjermestad*, 114 Wn.2d 828, 835, 791 P.2d 897 (1990).

¶34 The legislature did not define "group," "identifiable," or "hierarchy," but these terms are commonly understood and are not ambiguous. A "group" is "a number of individuals bound together by a community of interest, purpose, or function," or a "number of persons associated formally or informally for a common end or drawn together through an affinity of views or interests." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1004 (1976); *see also id.* at 1123 (defining "ideology" as "a manner or the content of thinking characteristic of an individual, group, or culture"). A group is "identifiable" if it is "subject to identification" or "capable of being identified." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1004 (1976). A "hierarchy" is "the classification of a group of people with regard to ability or economic or social standing." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1066 (1976).

¶35 When considered together, these definitions express the legislature's determination that a person's legal culpability for murder is greater if the murder is committed to advance the murderer's standing among a number of persons subject to identification and bound together, whether formally or informally, by a shared ideology or affinity of views. The range of groups falling within RCW 10-

.95.020(6) is nearly infinite and can include such entities as a cheerleading squad, a law firm, the Republican or Democratic Party, or the Catholic church. RCW 10.95.020(6) does not limit the structure or size of such a group or the nature of its ideology because such qualifiers are not necessary.

■ ■ ¶36 Under the plain language of RCW 10.95-.020(6), white supremacy is an "identifiable group" with a "hierarchy." As Pitcavage explained, white supremacists share a set of beliefs and customs and are bound together by a mission to "secure the existence of our race and a future for white children." 25 RP at 1598. Both Pitcavage and Blazak agreed that this mission embodies the white supremacist ideology. Also, according to Pitcavage, white supremacists have a "hierarchy." The hierarchy is not in the formal militaristic or corporate sense but in a "social standing" sense: "[S]omeone who's perceived to be really standing up for the white race, really being a white warrior, gets more result of status, gets more respect." 25 RP at 1635.

¶37 Blazak's testimony also supports the conclusion that white supremacy falls within RCW 10.95.020(6). The thrust of Blazak's testimony was that white supremacy was not an "identifiable group" because, if it was, it would be "[a] very broad-based group," similar to "people who are liberal, people who are conservative, environmentalists, pro death penalty people." 34 RP at 2957-58. But the breadth of the group base is immaterial, provided that the group is identifiable, has a hierarchy, and shares an ideology. As Blazak testified, white supremacists are a "finite number of people" who can be "identified" by their common ideology that "white people are superior and the white race is somehow threatened." 34 RP at 2923-24. Thus, both Pitcavage and Blazak's testimony reflected that white supremacy falls within the plain language of RCW 10.95.020(6).

OVERBREADTH

■ ■ ¶38 A statute is overbroad if it chills or sweeps within its prohibition constitutionally protected free speech

activities. *City of Bellevue v. Lorang*, 140 Wn.2d 19, 26, 992 P.2d 496 (2000). The First Amendment protects an individual's right to hold and express unpopular views and to associate with others who share that viewpoint. *Texas v. Johnson*, 491 U.S. 397, 414, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989).

¶39 In *Wisconsin v. Mitchell*, 508 U.S. 476, 113 S. Ct. 2194, 124 L. Ed. 2d 436 (1993), the Court rejected an overbreadth challenge to a statute enhancing a defendant's sentence if the crime was motivated by a discriminatory point of view. The defendant argued that the statute had a "chilling effect" on free speech because evidence of the defendant's prior speech or associations could be used to prove that the defendant intentionally selected his victim on account of the victim's protected status. The Court found no merit in this contention:

> The sort of chill envisioned here is far more attenuated and unlikely than that contemplated in traditional "over-breadth" cases. We must conjure up a vision of a . . . citizen suppressing his unpopular bigoted opinions for fear that if he later commits an offense covered by the statute, these opinions will be offered at trial to . . . qualify[ ] him for penalty enhancement. . . . This is simply too speculative a hypothesis to support [an] overbreadth claim.

*Mitchell*, 508 U.S. at 488-89.

¶40 RCW 10.95.020(6) is far less "intrusive" than the statute upheld in *Mitchell*. It is content neutral and does not intrude on constitutionally protected rights. RCW 10.95.020(6) merely requires an enhanced punishment for committing murder if the murder was committed to obtain, maintain, or advance one's position in the hierarchy of an organization, association, or identifiable group. That a political or other viewpoint was expressed through the particular murder or that the murder furthered the exercise of the murderer's association rights does not alter or shield the criminal act: "The First Amendment does not protect violence." *Nat'l Ass'n for the Advancement of Col-*

*ored People v. Claiborne Hardware Co.*, 458 U.S. 886, 916, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982). "[V]iolence or other types of potentially expressive activities that produce special harms distinct from their communicative impact . . . are entitled to no constitutional protection." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984). Accordingly, we reject Monschke's claim that RCW 10.95.020(6) is unconstitutionally overbroad in that it limits his First Amendment rights.

VAGUENESS

¶41 Monschke contends that the term "group" is too vague to satisfy due process notice requirements.[11] A statute is vague if it does not give fair notice of the proscribed conduct or clear standards to prevent arbitrary enforcement. *State v. Halstien*, 122 Wn.2d 109, 117, 857 P.2d 270 (1993). But a statute is not unconstitutionally vague merely because a person cannot predict with complete certainty the exact point at which his questionable actions are prohibited. *City of Seattle v. Eze*, 111 Wn.2d 22, 27, 759 P.2d 366 (1988). It is sufficiently definite if persons of ordinary intelligence can understand the statute's meaning, notwithstanding some possible areas of disagreement. *Eze*, 111 Wn.2d at 27. A statute "employ[ing] words with a well-settled common law meaning, generally will be sustained against a charge of vagueness." *Anderson v. City of Issaquah*, 70 Wn. App. 64, 75, 851 P.2d 744 (1993). We assess a vagueness challenge to a statute not implicating First Amendment rights in light of the statute's application to the case at hand. *Halstien*, 122 Wn.2d at 117.

---

[11] A vagueness challenge to an aggravating circumstance may be under either the due process clause of the Fourteenth Amendment or the Eighth Amendment's prohibition against cruel and unusual punishment. *See State v. E.A.J.*, 116 Wn. App. 777, 792, 67 P.3d 518 (2003), *review denied*, 150 Wn.2d 1028 (2004). An Eighth Amendment claim focuses on whether the challenged provision " 'fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with . . . open-ended discretion.' " *E.A.J.*, 116 Wn. App. at 792 (quoting *Maynard v. Cartwright*, 486 U.S. 356, 361-62, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988)). A due process challenge focuses on the sufficiency of notice to the accused. *E.A.J.*, 116 Wn. App. at 792.

¶42 As previously discussed, the term "group" is not ambiguous and its plain dictionary meaning includes white supremacy. A person of ordinary intelligence would understand that committing murder to advance one's position as a white supremacist is prohibited by RCW 9A.32-.030 and RCW 10.95.020(6). Monschke's vagueness challenge fails accordingly.

Sufficiency of the Evidence

¶43 Monschke next maintains that the evidence was insufficient to find that he murdered Townsend to advance his hierarchal position as a white supremacist. We disagree.

¶44 Evidence is sufficient to support a conviction if, when viewed in the light most favorable to the State, it permits a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004). A claim of insufficient evidence admits the truth of the State's evidence and all reasonable inferences that can be drawn from it. *Thomas*, 150 Wn.2d at 874. We defer to the trier of fact on decisions resolving conflicting testimony and the credibility of witnesses. *Thomas*, 150 Wn.2d at 874-75.

¶45 The record before us establishes the following: Monschke was a member of the white supremacist subgroup Volksfront; Volksfront associated with the violent subgroup National Alliance; Monschke wanted to advance his position in Volksfront and open a local chapter; acts of violence elevated a member's status in many white supremacist subgroups; Volksfront maintained a POW list on its web site that supported individuals who had committed violent hate crimes; Monschke posted messages on Volksfront's web site and used a screen name, "SHARPshooter," that advocated violence against a nonviolent white supremacist group; Monschke sought to elevate Frye's status by helping her obtain red shoelaces, which Monschke believed were earned by violent acts against "inferior" people; Monschke previously advanced his own position in Volksfront through

violent acts and wore red shoelaces and white suspenders as an indication of this advancement; Monschke, Butters, and Pillatos were underneath Interstate 705 looking to "do" someone "inferior"; Townsend was viewed as inferior by Monschke, Butters, and Pillatos; Townsend's murder elevated Butters's status; and Monschke wondered aloud whether Townsend's murder would elevate his status with God. Accepting this evidence as true, and taking all reasonable inferences in the light most favorable to the State, a rational trier of fact could find that Monschke murdered Townsend to advance his position as a white supremacist.

BIFURCATION MOTION

¶46 Monschke maintains that the trial court should have bifurcated his trial to separate the jury's consideration of the evidence of first degree murder from that supporting the aggravating circumstances. We disagree.

¶47 Monschke cites to no direct authority supporting bifurcation of an aggravated first degree murder trial under current law. A bifurcated procedure was required when the State alleged aggravating circumstances with a first degree murder charge under former RCW 9A.32.040-.045 and 10.94.020 (1977). But that statutory procedure has long since been repealed and replaced. Currently, bifurcation is required in an aggravated first degree murder prosecution only if the State files a notice of intent to seek the death penalty and the jury finds the defendant guilty of aggravated first degree murder. RCW 10.95.040-.050. Bifurcation then occurs between the trial on the *entire* first degree murder charge, including the aggravating circumstance, and the penalty phase in which the jury addresses whether there are sufficient mitigating circumstances to merit leniency. RCW 10.95.040-.080. The current statutes do not provide for bifurcated trials on first degree murder and the alleged aggravating circumstance.

¶48 We acknowledge, however, that the trial court has broad discretion to control the order and manner

of trial proceedings. ER 611; *State v. Johnson*, 77 Wn.2d 423, 426, 462 P.2d 933 (1969). Although bifurcated trials "are not favored," they may sometimes be necessary. *State v. Kelley*, 64 Wn. App. 755, 762, 828 P.2d 1106 (1992). For example, bifurcation is appropriate where the defendant argues insanity and a second inconsistent defense. *See State v. Jeppesen*, 55 Wn. App. 231, 236-38, 776 P.2d 1372, *review denied*, 113 Wn.2d 1024 (1989). Bifurcation is inappropriate if a unitary trial would not significantly prejudice the defendant or if there is a substantial overlap between evidence relevant to the proposed separate proceedings. *Jeppesen*, 55 Wn. App. at 237; *State v. Jones*, 32 Wn. App. 359, 369, 647 P.2d 1039 (1982), *rev'd on other grounds*, 99 Wn.2d 735, 664 P.2d 1216 (1983). We review a bifurcation decision for abuse of discretion. *Jeppesen*, 55 Wn. App. at 236. A court abuses its discretion only when its decision is manifestly unreasonable or based on untenable grounds. *State v. Stenson*, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998).

¶49 Monschke argues that bifurcation of his trial was necessary to keep the jury from considering his white supremacist beliefs when it deliberated on the elements of premeditated first degree murder. But as discussed more thoroughly in the unpublished portion of this opinion, evidence of Monschke's white supremacist beliefs was relevant to show that he had a motive for Townsend's murder and that he premeditated and intended to cause an "inferior" person's death. *See Stenson*, 132 Wn.2d at 702 ("Evidence of a defendant's motive is relevant in a homicide prosecution."); *State v. Campbell*, 78 Wn. App. 813, 821-22, 901 P.2d 1050 (group membership is relevant evidence of premeditation and motive when there is a sufficient nexus between the group affiliation and the motive for committing the crime), *review denied*, 128 Wn.2d 1004 (1995). Here, the trial court's denial of the motion rests on tenable ground and the court did not abuse its discretion in refusing to bifurcate Monschke's trial.

STUN BELT

¶50 Monschke asserts that the court erred in requiring that he wear a stun belt underneath his clothes at trial. We disagree.

¶51 Absent extraordinary circumstances, a defendant is entitled to appear at trial free from all restraints. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 693, 101 P.3d 1 (2004). But a trial court has inherent authority to determine what security measures are necessary to maintain decorum in the courtroom and to protect the safety of courtroom occupants. *State v. Damon*, 144 Wn.2d 686, 691, 25 P.3d 418, 33 P.3d 735 (2001). Restraints may be used if they are necessary to prevent escape, injury, or disorder in the courtroom. *Damon*, 144 Wn.2d at 691. In deciding whether to restrain a defendant during trial, a court should consider, among other things, (1) the seriousness of the present charge, (2) the defendant's temperament and character, (3) the defendant's history of disruptive behavior, and (4) the adequacy and availability of less restrictive alternatives to restraint. *Damon*, 144 Wn.2d at 691 (setting forth 12 specific factors).

¶52 To overturn a jury's verdict, a defendant challenging the use of restraints must make a threshold showing that the restraints had a " 'substantial or injurious effect or influence on the jury's verdict.' " *Davis*, 152 Wn.2d at 694 (quoting *State v. Hutchinson*, 135 Wn.2d 863, 888, 959 P.2d 1061 (1998), *cert. denied*, 525 U.S. 1157 (1999)). This requires evidence that the jury saw the restraints or that the restraints substantially impaired the defendant's ability to assist in his trial defense. *See State v. Finch*, 137 Wn.2d 792, 845, 975 P.2d 967, *cert. denied*, 528 U.S. 922 (1999); *Hutchinson*, 135 Wn.2d at 888; *State v. Jennings*, 111 Wn. App. 54, 61, 44 P.3d 1 (2002) (stun belt), *review denied*, 148 Wn.2d 1001 (2003).

¶53 Here, after ruling that Monschke be required to wear a stun belt under his clothes during trial, the court instructed defense counsel to bring any visibility concerns to the court's attention. No such complaints were made.

Before its ruling, the court had not noticed that Monschke was being forced to wear the belt by jail personnel. Monschke offers only conclusory statements that the belt hampered his participation in his trial defense. But Monschke did not express any such concerns to the trial court. Monschke's failure to establish prejudice from the court's decision that he wear a stun belt defeats this assignment of error.

¶54 Nonetheless, we briefly address the propriety of the trial court's ruling. Here, the trial judge witnessed a violent and serious incident in her courtroom. Monschke was spitting and yelling at his then codefendants, Butters and Pillatos. Monschke escalated the level of violence by throwing a chair, using racial slurs, and resisting the guard's attempts to defuse the situation and subdue him. Monschke represents to this court that the incident reflected "irrational behavior," raising serious competency concerns. Statement of Additional Grounds at 5. The incident was all the more alarming as it occurred before Monschke's codefendants pleaded guilty and agreed to testify at his trial.

¶55 The trial court held a hearing and examined witnesses on the issue. It heard testimony that Monschke represented a continuing threat when not restrained. Monschke had been caught in the county jail possessing makeshift weapons and repeatedly attempting to instigate fights with other prisoners. The evidence before the trial court established that a stun waist belt was the least restrictive alternative: it was not plainly visible or as inhibiting as chains or shackles; it did not carry with it the obvious prejudice of being closely surrounded by several armed officers; and prisoners often found it more comfortable than the stun ankle belt. In our view, the court's order requiring Monschke to wear a stun belt was well considered and proper.

¶56 Affirmed.

¶57 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder

shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

BRIDGEWATER and PENOYAR, JJ., concur.

Review denied at 159 Wn.2d 1010 (2007).