[No. 15784-9-III.   Division Three.   May 28, 1998.]

THE STATE OF WASHINGTON, *Respondent*, v. PHILLIP DUANE FLIEGER, *Appellant*.

*Suzanne Lee Elliott,* for appellant.

*Steven M. Lowe, Prosecuting Attorney,* for respondent.

KURTZ, A.C.J. — Phillip Flieger was charged in the alternative with first degree murder, or second degree felony murder based upon residential burglary. At trial, Mr. Flieger was required to wear a "shock box" strapped to his waist and placed under his shirt. The court refused to order the box removed. A jury convicted Mr. Flieger of second degree felony murder. He appeals contending the court abused its discretion by failing to conduct a hearing to examine the factual basis for requiring him to wear the box. We agree and reverse.

During jury voir dire, Mr. Flieger asked the court to order the removal of the shock box he was wearing because it was prejudicial to his right to a fair trial. The court responded:

> [T]he Court is not the one that determines the initial security precautions, if you will, and the Court must defer to the Sheriff's Office in that regard, and if the Sheriff's Office determines that it's necessary to use the box, then unless shown otherwise, then the Court will respect the wishes of the Sheriff's Office in that regard.
>
> Certainly, it's less obtrusive than shackling or some other method, and I've authorized it before with other defendants.

Later, but still during voir dire, Mr. Flieger learned

members of the jury panel had noticed the box and were discussing it. In response to a motion that a juror be removed for making a statement about the shock box, the judge interviewed members of the jury panel in chambers.

Two of the jurors involved admitted to the court they had noticed the shock box on Mr. Flieger's back and were discussing it. One juror asked the other, "Do you see that square thing that's on Flieger's back? . . . 'I think maybe it might have, you know, the bracelets they wear on their ankle sometimes.' " One juror stated he saw the sheriff holding something and thought maybe it was related to the device worn by Mr. Flieger. The court asked the jurors to stop discussing the box and allowed them to continue their jury service. Mr. Flieger wore the box during the remainder of his trial.

At trial, the State's primary evidence was testimony from Scott Gant. Mr. Gant testified Mr. Flieger was responsible for the events leading up to the death of Juan Flores Martinez. He stated he accompanied Mr. Flieger to Mr. Martinez's residence to purchase drugs. After they drove by the residence and determined no one was home, they decided to steal the drugs. Upon entering the residence, the two men discovered Mr. Martinez was at home. Mr. Flieger asked Mr. Martinez to get some drugs for them. He denied having any and asked his intruders to leave. A struggle between Mr. Gant and Mr. Martinez ensued.

Mr. Gant admits he hit Mr. Martinez over the head several times with an iron. He states Mr. Martinez stabbed him in the neck. After he was stabbed, Mr. Gant states he ran out of the residence and down the street. Mr. Flieger followed and when he saw Mr. Gant had been stabbed, he ran back in the direction of Mr. Martinez's residence. He later returned, and assisted the bleeding Mr. Gant into the car and drove him to his house. Because Mr. Gant testified Mr. Martinez was not bleeding and had not been stabbed when he left the residence, the jury was asked to infer Mr. Martinez's fatal stab wound was inflicted by Mr. Flieger after he returned to the Martinez residence.

There was some corroboration for Mr. Gant's testimony. Mr. Martinez's neighbor reported she heard three voices in Mr. Martinez's residence the night he was killed. Mr. Gant's girl friend stated she saw Mr. Flieger with Mr. Gant on the day Mr. Martinez was killed. Two separate witnesses testified they saw Mr. Flieger and his car at least twice before at or near Mr. Martinez's residence. A K-9 officer tracked the blood trail that stopped half a block from the residence. Clothes and other items seized from Mr. Flieger's motel room contained stains of the blood types of both Mr. Gant and Mr. Martinez. Mr. Gant's clothing and shoes also had Mr. Martinez's blood type on them.

The jury convicted Mr. Flieger of second degree felony murder. He now appeals.

■ The rule that a criminal defendant is entitled to appear at trial free of manacles or bonds is described as "ancient" and was recognized as early as 1722. *State v. Williams*, 18 Wash. 47, 49, 50 P. 580 (1897); *see Illinois v. Allen*, 397 U.S. 337, 344, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970). This right is based upon the legal principle that a person accused of a crime is presumed innocent until his guilt has been established beyond a reasonable doubt. *United States v. Samuel*, 431 F.2d 610 (4th Cir. 1970). Courtroom practices that unnecessarily mark the defendant as dangerous or guilty undermine the presumption of innocence. *Id.* at 614. If a defendant is to be presumed innocent, he must be allowed "the indicia of innocence." *Id.*

In Washington, the constitutional basis for the rule against using physical restraints on the accused is article I, section 22 (amendment 10), which provides: "[i]n criminal prosecutions the accused shall have the right to appear and defend in person[.]" This has been held to mean that if a defendant appears in chains or irons, the jury "must necessarily conceive a prejudice against the accused, as being in the opinion of the judge a dangerous man, and one not to be trusted, even under the surveillance of officers." *Williams*, 18 Wash. at 51.

■ This right is balanced against the State's interest in an orderly trial. *State v. Maryott*, 6 Wn. App. 96, 103, 492 P.2d 239 (1971). Consequently, the State may take measures to ensure an orderly trial but the measures should not be imposed upon the defendant until a need has been shown, and the control imposed should ensure an orderly trial with the least interference with a defendant's rights. *Id.*; *Loux v. United States*, 389 F.2d 911, 919 (9th Cir. 1968).

The extent to which security measures are necessary is within a trial judge's discretion. *State v. Hartzog*, 96 Wn.2d 383, 400, 635 P.2d 694 (1981). That discretion "must be founded upon a factual basis set forth in the record." *Id.* To this end, the Supreme Court has approved the following standards for the trial court to consider when confronted with this problem:

> [T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.

*Id.* at 400 (quoting *State v. Hartzog*, 26 Wn. App. 576, 588, 615 P.2d 480 (1980)). Thus, the trial court must conduct a hearing and make a record before imposing restraints upon a criminal defendant.

The record shows that the decision to use a shock box to restrain Mr. Flieger was made by members of the sheriff's office responsible for his custody. When Mr. Flieger's counsel objected, the court declined to involve itself with this decision, saying: "the Court is not the one that determines the initial security precautions, if you will, and the Court must defer to the Sheriff's Office in that regard[.]" In this respect, the case is similar to *People v. Jacla*, 77 Cal. App. 3d 878, 144 Cal. Rptr. 23 (1978), in

which the court deferred to the bailiff's decision to use leg irons on a defendant. On appeal, the court stated:

> It might well have been appropriate to solicit the opinion of the bailiff, the person responsible for the security of the courtroom, in the course of a judicial determination as to what restraints, if any, were necessary. But, the determination to impose restraints and the nature of the restraints to be imposed are judicial functions to be discharged by the court, not delegated to a bailiff.

*Id.* at 885. We agree with the reasoning of the California appellate court. The trial court's failure to exercise its discretion was an abuse of discretion.

Acknowledging the absence of a hearing and record in this case, the State attempts to distinguish the shock box from traditional restraints such as handcuffs, leg-irons, waist chains, and gags. Because the shock box does not restrain physical movement and cannot be seen by the jurors, the State maintains it differs significantly from other methods of restraint. Consequently, the State argues the shock box cannot be used as a basis for drawing inferences about Mr. Flieger's guilt or propensity for violence.

While these distinctions are legitimate, they are not applicable in this case. The record demonstrates that the jurors were aware of the shock box and were speculating about it. Its use may have suggested to the juror that Mr. Flieger was a dangerous person who could not be trusted or controlled, even in the presence of an armed officer. The use of the shock box may be even more prejudicial than handcuffs or leg-irons because it implies that unique force is necessary to control the defendant.

The State argues the error is harmless and cites as support *United States v. Burt*, 76 F.3d 1064 (9th Cir. 1996), and *Castillo v. Stainer*, 983 F.2d 145, 997 F.2d 669 (9th Cir. 1992). The opinion in *Burt* was wholly withdrawn and subsequently replaced by an unpublished opinion and thus cannot be cited for precedential value. In *Castillo*, the criminal defendant was forced to wear a waist chain restraint.

The Ninth Circuit found it was harmless error because at no time could the jury see the belt and thus it could not affect the presumption of innocence. *Castillo*, 983 F.2d at 149. This case is distinguishable from *Castillo* because at least two jurors demonstrated some knowledge of the existence of the shock box.

■ Finally, the State contends that even if it was error to use a shock box, the error was harmless because Mr. Flieger was not convicted of the greater charge, first degree murder. An error infringing upon a defendant's constitutional rights is presumed to be prejudicial, and the State has the burden of proving the error was harmless. *State v. Caldwell*, 94 Wn.2d 614, 618-19, 618 P.2d 508 (1980). "A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error." *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). While the jury did not convict Mr. Flieger of the greater charge, it also did not acquit him. We cannot determine beyond a reasonable doubt that the State's use of the shock box had no effect on the jury's impression of Mr. Flieger's guilt.

The conviction is reversed and the case remanded for a new trial.

Mr. Flieger raises several issues, pro se. Because we have ordered a new trial, they need not be addressed.

SWEENEY and BROWN, JJ., concur.

Review denied at 137 Wn.2d 1003 (1999).