[No. 70070-2.  En Banc.]
Argued March 29, 2001.    Decided June 14, 2001.

THE STATE OF WASHINGTON, *Respondent*, v. FELIX DAMON, *Petitioner*.

*Elaine L. Winters* (of *Washington Appellate Project*), for petitioner.

*Norm Maleng, Prosecuting Attorney*, and *David L. Ryan, Deputy*, for respondent.

OWENS, J. — In this appeal, we must decide whether the trial court's decision to hold the defendant in a restraint chair during trial was a harmless error. The defendant was convicted of second-degree assault, attempted first-degree rape, first-degree robbery, and unlawful imprisonment. Upon review of his conviction, the Court of Appeals concluded that the trial court erred by requiring the defendant to remain in a restraint chair because the trial court had failed to articulate a basis for its decision. However, the Court of Appeals also concluded that the error was harmless beyond a reasonable doubt in light of the defendant's diminished capacity defense. Because we conclude that the error was not harmless, we reverse the decision of the Court of Appeals and reverse the defendant's conviction.

## FACTS

During March 1995, Felix Damon experienced many problems with his sister and her family. On April 8, 1995, he became hysterical about these problems and consumed

large quantities of alcohol and Valium pills. Later that night, Damon returned to his home and asked Esther Huff, his landlady, to cook him dinner. Ms. Huff, told him that it was late, but she heated up a pizza for him. She thought that Damon was acting strangely and that he was intoxicated. When the pizza was ready, Ms. Huff told Damon to eat it in his room downstairs, but he refused to do so. Instead, Damon sat down in the front room and began eating. At this point, Ms. Huff and Damon argued about the rent, and he retrieved a knife from the kitchen and demanded money from her. Damon cut Ms. Huff's arm during a scuffle that occurred between them.

Ms. Huff retreated into her bedroom, and Damon followed her and threw her money around the room. Next, Damon went to Ms. Huff's bed and asked her to have sex with him. When she refused, Damon climbed on top of her and attempted to have sex with her. Later, Damon apologized and asked Ms. Huff to forgive him. For two days, Damon remained upstairs in her house, and he picked up the knife every time that the phone rang. Damon also adjusted the blinds several times during the day. Finally, Damon began tying her up with an extension cord, but he left when she said that she would not call the police.

Damon was arrested and charged with second-degree assault, attempted first-degree rape, first-degree robbery, and unlawful imprisonment. Trial was delayed for 18 months, and Damon attempted suicide on several occasions. In addition, the trial court held several competency hearings due to Damon's continuing mental problems. Damon was initially brought before the court in shackles and leg irons, and defense counsel requested that the shackles be removed. The trial court granted the request, but a security guard advised the court that Damon would need to be placed in a restraint chair if the shackles were removed. Although the defense counsel objected, the trial court simply deferred to the security concerns raised by the officer.

At trial, defense counsel called witnesses to support

Damon's defense of diminished capacity. Dr. Steve Clancy explained that, in stressful situations, Damon's mental disorders would cause him to be panicky and unable to regulate his thought processes. Moreover, Dr. Clancy testified that Damon's ability to form the requisite intent to commit the crimes charged was significantly impaired. In addition, Damon's sister-in-law confirmed that Damon had been depressed due to his fight with his sister, and Damon's sister Imogene confirmed that Damon had been abused mentally, physically, and sexually as a child. Finally, Damon's brother Dewey confirmed that Damon had been drinking several beers and wine coolers on April 8, 1995.

The jury convicted Damon on all counts, and Damon was sentenced to life in prison. Damon appealed on grounds that the trial court erred in requiring him to be held in the restraint chair during trial. The Court of Appeals agreed that the trial court had erred by failing to enter findings to justify its conclusion that Damon should be restrained; however, the Court of Appeals also concluded that the error was harmless in light of Damon's diminished capacity defense. Damon sought discretionary review, which we granted. We remanded the case for reconsideration in light of *State v. Finch*;[1] however, the Court of Appeals determined that its original conclusions were correct. In January 2001, we again accepted review.

## ISSUE

Did the trial court commit reversible error by ordering the defendant to be held in a restraint chair during trial?

## ANALYSIS

■ We have long recognized that a prisoner is entitled to be brought into the presence of the court free from restraints. *See State v. Williams*, 18 Wash. 47, 50, 50 P. 580 (1897). Keeping a defendant in shackles may violate his

---

[1] 137 Wn.2d 792, 975 P.2d 967, *cert. denied*, 528 U.S. 922 (1999).

constitutional rights because " 'the jury must necessarily conceive a prejudice against the accused, as being in the opinion of the judge a dangerous man, and one not to be trusted, even under the surveillance of officers.' " *Id.* at 51 (quoting *State v. Kring*, 64 Mo. 591 (1877)). In addition, we have also recognized that use of restraints may affect the defendant's constitutional rights, including the right to be presumed innocent, the right to testify on one's own behalf, and the right to confer with counsel during the course of a trial. *State v. Hartzog*, 96 Wn.2d 383, 398, 635 P.2d 694 (1981). Finally, keeping the defendant in restraints during trial may deprive him of the full use of all his faculties. *Williams*, 18 Wash. at 51.

■■ The trial court has broad discretion to determine what security measures are necessary to maintain decorum in the courtroom and to protect the safety of its occupants. *See State v. Finch*, at 873 (Talmadge, J., dissenting). In determining whether the use of restraints is justified, the trial court may consider the following factors:

> "[T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and the mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies."

*Id.* at 848 (quoting *Hartzog*, 96 Wn.2d at 400). Nevertheless, we have also recognized that shackles or other restraining devices should "be used only when necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape." *Hartzog*, 96 Wn.2d at 398. Finally, the trial court should allow the use of restraints only after conducting a hearing and entering findings into the record that are sufficient to justify the use

of the restraints. *See State v. Flieger*, 91 Wn. App. 236, 241, 955 P.2d 872 (1998), *review denied*, 137 Wn.2d 1003, 972 P.2d 466 (1999).

We have noted that a trial court is required to exercise discretion in determining whether use of restraints is necessary to maintain decorum in the courtroom. *Finch*, 137 Wn.2d at 846. However, we have also explained that it is an abuse of discretion for the trial court to base its decision to use restraints solely upon concerns expressed by a correctional officer. *Id.* at 853. Because the trial court relied solely on the security concerns raised by the officer and failed to conduct a hearing, we conclude that the trial court abused its discretion by requiring Damon to be held in restraints throughout his trial.[2]

Since the trial court committed error by ordering the defendant to be held in the restraint chair, we must consider whether the error was harmless. *See Finch*, 137 Wn.2d 792. The error will not be considered harmless unless the State demonstrates that the shackling did not influence the jury's verdict. *State v. Clark*, 143 Wn.2d 731, 775, 24 P.3d 1006 (2001) (citing *State v. Belmarez*, 101 Wn.2d 212, 216, 676 P.2d 492 (1984)), *cert. denied*, 122 S.Ct. 475 (2001). For example, the Court of Appeals concluded that the use of a shock box to restrain a defendant was not harmless error because the record showed "that the jurors were aware of the shock box and were speculating about it." *Flieger*, 91 Wn. App. at 242.

Based on the design of the chair, we conclude that the

---

[2] Even if the trial court had conducted a hearing, it is not clear from the record that the use of restraints would have been justified. For example, Damon had not been "acting out" while he was being held at Western State Hospital. Report of Proceedings (RP) (Sept. 20, 1996) at 5. Damon did attempt to commit suicide while he was in custody; however, we have noted that use of restraints is not justified simply because the defendant attempted to commit suicide while in custody. *Finch*, 137 Wn.2d at 851-52. The defendant also made some comments while the judge was making rulings regarding pretrial motions, but these comments alone are not sufficient to justify the use of restraints during trial. *See* RP (Sept. 30, 1996) at 95 (defendant states "Bull shit"), 105 (defendant states "I bought that"). Nor did the trial court consider these outbursts when it made the decision to require that Damon be held in the restraint chair.

jurors were aware that the defendant was being held in a restraint chair. Specifically, the chair had straps that held the defendant across both shoulders, down to his waist, and across his waist. In addition, the defendant's legs were both strapped and manacled. As we have noted, the use of such restraints "may have suggested to the juror[s] that [the defendant] was a dangerous person who could not be trusted or controlled, even in the presence of an armed officer." *Flieger*, 91 Wn. App. at 242. Moreover, the restraint chair, like the shock box in *Flieger*, "may be even more prejudicial than handcuffs or leg-irons because it implies that unique force [was] necessary to control the defendant." *Id.* Because the jury must have observed that the defendant was being restrained and that the restraints were unusual, we conclude that the defendant has satisfied his burden to show that the restraints influenced the jury's verdict.

Nevertheless, we must also consider whether the error was harmless based on the overwhelming evidence test. *Finch*, 137 Wn.2d at 862. When we conduct harmless error analysis under the overwhelming evidence test, the court "looks only at the untainted evidence to determine if the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt." *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985). The State bears the burden of proving that the error was harmless beyond a reasonable doubt. *Id.* at 425.

At trial, Damon did not dispute that he had committed all of the criminal acts as charged; however, he raised a diminished capacity defense, contending that his mental condition and alcohol consumption had impaired his ability to form the requisite criminal intents. We have explained that "[t]o maintain a diminished capacity defense, a defendant must produce expert testimony demonstrating that a mental disorder, not amounting to insanity, impaired the defendant's ability to form the culpable mental state to commit the crime charged." *State v. Atsbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001). During trial, the defense offered the testimony of Dr. Steve Clancy to support

Damon's diminished capacity defense. Dr. Clancy is a psychologist, specialized in the treatment of borderline personality disorders.

At trial, Dr. Clancy testified that Damon's capacity to form the requisite criminal intents was significantly impaired due to Damon's mental disorders and the amounts of drugs and alcohol that he had consumed on April 8, 1995. However, the trial court concluded that significant impairment was not the proper standard for a diminished capacity defense, and the judge explained that the defendant must have lacked the ability to form specific intent. In response to this ruling, Dr. Clancy further testified that Damon generally has the capacity to form intents to act when he is not stressed or highly aroused. However, Dr. Clancy also testified that Damon lacked the ability to form the requisite criminal intents on April 8, 1995. Dr. Clancy confirmed that, when Damon is stressed, his borderline personality disorder leaves him panicky and unsure of how to regulate his thinking. Finally, Dr. Clancy stated that Damon's alcohol consumption contributed to his impaired ability to form the requisite intent. Based on this expert testimony, we conclude that Damon offered sufficient evidence to present a viable diminished capacity defense.

In contrast, the State offered testimony from two witnesses who had observed the defendant while he was housed at Western State Hospital. Both Dr. Carl Redick and Dr. Charles Hale concluded that Damon did in fact have the capacity to form the requisite criminal intents. Dr. Redick was employed at Western State Hospital as a clinical psychologist, and he was assigned to the legal offender unit to perform evaluations with regard to the inmates' competency to stand trial. In addition, Dr. Redick had training in criminal forensics and had taught seminars on diminished capacity. On the other hand, Dr. Hale was employed as a psychiatrist at Western State Hospital, and he was also assigned to the legal offender unit. Like Dr. Redick, Dr. Hale was also trained in criminal forensics.

Because the State offered testimony that directly contra-

dicted the testimony of the defendant's witness, the jury was required to assess the credibility of the witnesses. During closing arguments, the prosecutor noted that Dr. Clancy lacked experience as a forensic psychiatrist. In addition, the prosecutor noted that all three expert witnesses had testified that Damon had the capacity to form the requisite criminal intent. However, the prosecutor failed to note that Dr. Clancy had also testified that Damon lacked the *ability* to form the requisite criminal intent. We also note that the fact that Dr. Clancy had not been trained in criminal forensics does not make his testimony less credible, especially in light of the fact that he had expertise regarding borderline personality disorders. Thus, we conclude that Dr. Clancy offered credible testimony to support Damon's diminished capacity defense. Furthermore, we conclude that the testimony offered by the State is not so overwhelming as to require a guilty verdict in this case. Because the untainted evidence was not overwhelming, we conclude that the error was not harmless and that the decision of the Court of Appeals should be reversed.

## CONCLUSION

Generally, a defendant has the right to appear at trial free from restraints unless the trial court properly determines that restraints are required. We conclude that the trial court in this case abused its discretion by failing to enter factual findings sufficient to justify the use of the restraint chair. The improper use of the restraint chair violated Damon's right to have the jury presume that he was innocent. In addition, we conclude that the error was not harmless because the State has not proven that the restraints did not influence the jury's verdict. Moreover, we conclude that Damon presented a viable diminished capacity defense, and the untainted evidence was not so overwhelming as to require a guilty verdict. Thus, we reverse

the decision of the Court of Appeals and reverse Damon's conviction.

ALEXANDER, C.J., and SMITH, JOHNSON, MADSEN, SANDERS, IRELAND, BRIDGE, and CHAMBERS, JJ., concur.

After modification, further reconsideration denied October 5, 2001.