# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 67572-9-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| GUY ADAM ROOK, | ) | |
| | ) | |
| Appellant. | ) | FILED: June 24, 2013 |

GROSSE, J. — A trial court does not violate a criminal defendant's right to appear at trial without physical restraints when, as here, the trial court ordered the defendant to wear a stun belt that was not visible to the jury and there was no showing that it in fact interfered with his ability to participate in the trial. Accordingly, we affirm.

## FACTS

On August 25, 2009, at approximately 11:40 p.m., Sergeant Dan Flynn was in his patrol car driving on South 154th Street at the north end of SeaTac Airport. As Flynn drove around a blind corner, he saw a car approaching him from the opposite direction that was traveling at a very high speed and was partially over the center line. The posted speed limit was 35 m.p.h. but Flynn estimated the car's speed at 70 m.p.h. Flynn anticipated a collision and pulled off the road immediately and braced for impact. The car then sped past Flynn and continued around the corner. Flynn activated his emergency lights and began a pursuit of the speeding car. He pursued the car as it accelerated eastbound toward the traffic light at South 154th Street and 24th Avenue South.

At the time, Christopher Kalaluhi was waiting at the traffic light at that intersection, heading south on 24th Avenue South. When the light turned green,

Kalaluhi drove through the intersection and the speeding car crashed into Kalaluhi's car on the passenger side of the car. Kalaluhi's car spun through the intersection and crashed into a power pole.

Kalaluhi's coworker, Lori Partridge, was in the car behind Kalaluhi's car at the intersection and went to help Kalaluhi after the collision. As she approached the scene, she saw a man later identified as Guy Rook emerge from the driver's side of the speeding car. Rook appeared to Partridge as if he was going to fall over, then stumbled across the street and went into some bushes. Just as Partridge began to call 911, Sergeant Flynn arrived. Partridge then approached Kalaluhi's car, which she described as "flat as a pancake" and saw that Kalaluhi's face was bleeding and that he looked frightened. Flynn described Kalaluhi as "basically wrapped in metal," and "bleeding severely from [his] face."

Flynn called for aid and then went to check on the passenger in Rook's car, identified as Tracy Rectenwald.[1] Rectenwald did not have any visible injuries except for a mark from the seatbelt and told Flynn that she was okay. Flynn then saw Rook return to the scene. Flynn handcuffed Rook and had another officer place him in a patrol car. Shortly after, Deputy Andy Conner contacted Rook and noted that he had bloodshot eyes, slurred speech, and an odor of alcohol on his breath. Conner advised Rook of his rights and asked him how much he had to drink. Rook replied, "Too much; I'm drunk." Rook also told Conner that his arm was injured and Conner took him to the hospital.

At the hospital, a physician's assistant examined Rook and noted that Rook smelled of alcohol and appeared intoxicated. Deputy Conner then read Rook the

---

[1] We note that Tracy Rectenwald's last name is spelled two different ways in the record. For this opinion we use the spelling "Rectenwald."

2

implied consent warnings for a blood test and asked Rook if he would provide a blood sample. Rook responded, "Fuck that, I'm going to prison, anyway, so I ain't going to help you." Rook was belligerent and verbally abusive to Conner and the hospital staff and eventually insisted on leaving the hospital against medical advice.

Kalaluhi had to be cut out of his car before he could be transported to the hospital. He was initially transported to Highline Medical Center but was then transferred to Harborview Medical Center due to the severity of his injuries. Kalaluhi had suffered a lacerated spleen, a fractured vertebra, and extensive cuts on his face and head. The physician who treated him at Harborview determined that Kalaluhi's splenic laceration was a life threatening injury because of the risk of it breaking open and causing acute internal bleeding. Kalaluhi's spleen eventually healed without surgical intervention. Kalaluhi also suffered nerve damage that continues to affect the functioning of his right arm and he is still in pain on a daily basis.

The State charged Rook with one count of vehicular assault alleged to have been committed by the alternate means of driving under the influence (DUI) and in a reckless manner and one count of felony hit and run. Rook was facing a life sentence under the Persistent Offender Accountability Act (POAA) if convicted of vehicular assault, which would have been his third serious offense. Rook discharged three court appointed attorneys and, after an unsuccessful motion to discharge a fourth, he decided to proceed pro se and waived his right to counsel.[2]

Throughout the protracted pretrial proceedings, Rook was belligerent and verbally abusive to the court and counsel. At one point when the court advised Rook

_____

[2] The court appointed his fourth defense attorney to serve as standby counsel during his pro se representation.

3

that it was not prepared to address his discovery motions, Rook exclaimed, "Thanks for fucking me again! Piece of --." Rook repeatedly became agitated as the court requested that he show some self control.

Counsel for the King County Jail then brought a motion for the court to order Rook to wear a "Band-It," a fabric band placed under the clothes that delivers an electric shock when activated by a hand held control by a corrections officer. The motion was based on Rook's volatile behavior, his jail infractions, and the fact that he was facing a life sentence. The court held a hearing in which the jail cited several infractions he committed which demonstrated "a lack of deference to authority and frequent and repeated displays of rage and lack of control, not to mention threats and assaults." Rook also testified, denying the infractions and claiming that he would not "act a fool" in the courtroom.

When the trial court asked Rook if he had any alternative suggestions other than wearing the Band-It, Rook noted there were "armed guards in here that are told to kill you if you try to do anything stupid." The trial court then asked for suggestions "[o]ther than having a guard kill you." Rook replied, "I guess the best thing, if you decide that I'm going to be a fool, would be that leg band thing that the jury can't see."

The court confirmed with jail counsel and the jail captain that the Band-It would be placed on Rook's calf under his clothing and would not be visible to the jury, that the officer who had the control device would be seated unobtrusively in another part of the courtroom, and that it would not be activated unless there was an attempted escape or attempted assault. The court also expressed concerns about the ability to maintain security without the Band-It in light of the physical layout of the courtroom. Rook then

4

agreed to wear the Band-It through the following exchange with the court:

> THE COURT: Okay. So I guess my initial point is, I haven't made any ruling as to whether I will require it or not, but I do know that the security -- the way it looks is going to be much different if you choose to have [the Band-It] or if I order it, even over your objection.
> MR. ROOK: Go ahead and order it, I've got no problem.
> THE COURT: Okay. All right.
> MS. BALIN [counsel for the jail]: Very well, your Honor.
> THE COURT: So we'll do that.

The court granted the jail's motion for Rook to wear the Band-It.

At trial, Rook testified and claimed that he had not been drinking on the night of the accident but that his passenger, Rectenwald, was drinking heavily. According to Rook, they were arguing in the car while he was driving and Rectenwald dumped her drink in his lap as they were rounding the corner past Flynn's police car, which caused him to swerve into the oncoming lane. He further claimed that he crashed into Kalaluhi's car because Rectenwald had hit him in the head and knocked off his glasses. Rook also claimed he left the scene because he was going for help. He denied that he told Deputy Conner that he had too much to drink and that he was asked to take a blood test at hospital.

The jury found Rook guilty of vehicular assault but acquitted him of felony hit and run. The jury also made a finding that Rook was guilty of vehicular assault under the reckless manner alternative means, but not the DUI alternative means. At sentencing, the trial court found that Rook's criminal history included a conviction for first degree robbery and a conviction for first degree rape of a child, both of which carried a statutory maximum penalty of life in prison and qualified as serious offenses under the POAA. Accordingly, because the vehicular assault counted as a third serious offense, the court sentenced Rook to life in prison without the possibility of parole as required by the

5

statute.

## ANALYSIS

Rook first contends that the trial court erred by ordering him to wear a stun belt because there was no basis in the record that such a restraint was necessary. Thus, he claims that the court violated his constitutional right to appear at a jury trial free from restraints and prejudiced his ability to participate at trial. Accordingly, he contends that reversal of his conviction is required. We disagree.

Our courts have long recognized that the use of restraints may affect a criminal defendant's constitutional rights to be presumed innocent, to testify on one's own behalf, and to confer with counsel during the course of a trial.[3] Additionally, keeping the defendant in restraints during trial may deprive him of the full use of all of his faculties.[4] But the trial court also has "broad discretion to determine what security measures are necessary to maintain decorum in the courtroom and to protect the safety of its occupants,"[5] and restraining devices may be used "when necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape."[6]

Accordingly, the court may determine that the use of restraints is justified after considering a number of factors, including:

> [T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the

---

[3] State v. Hartzog, 96 Wn.2d 383, 398, 635 P.2d 694 (1981).
[4] State v. Damon, 144 Wn.2d 686, 691, 25 P.3d 418 (2001).
[5] Damon, 144 Wn.2d at 691.
[6] Hartzog, 96 Wn.2d at 398.

courtroom; and the adequacy and availability of alternative remedies.[7] Before allowing the use of restraints, the trial court should conduct a hearing and enter findings that are sufficient to justify their use.[8]

Here, the trial court conducted a hearing in which the court considered declarations of jail personnel as well as Rook's testimony. The court also asked Rook for input on other alternatives and he agreed to use the Band-It. The court then ordered Rook to wear the Band-It, citing security concerns about the physical layout of the courtroom, the fact that Rook was facing a life sentence, and Rook's express agreement that he would wear it.

While the court did not enter written findings, the record supports the court's ruling. As noted above, the jail presented evidence that demonstrated "a lack of deference to authority and frequent and repeated displays of rage and lack of control, not to mention threats and assaults." While Rook denied these allegations, the trial court was entitled to resolve issues of credibility in making factual findings. The record also shows that Rook continued to be disruptive during trial, even forcing the trial court at one to point to warn him that he was "one comment from [the court] asking the officer to activate [the Band-It]" when he shouted out to the jurors as they were being excused at the close of the evidence. Because the trial court is in the unique position to observe and assess the actual demeanor of the defendant, we accord it due deference in exercising its discretion. The fact that a defendant "cannot behave in an orderly manner while in the courtroom" does provide a reasonable basis upon which a court may

---

[7] Hartzog, 96 Wn.2d at 400 (quoting State v. Hartzog, 26 Wn. App. 576, 588-89, 615 P.2d 480 (1980)).
[8] Damon, 144 Wn.2d at 691-92.

7

exercise its discretion and order restraints.[9]  Here, given the evidence presented by the jail and the defendant's conduct during the proceedings, the trial court did not abuse its discretion by ordering the Band-It.

Additionally, the trial court's other concerns—layout of the courtroom and seriousness of the charge—are legally sufficient to support its ruling.  The trial court also considered other alternatives and in fact when asked for his input, Rook agreed to use of the Band-It.  While Rook argues that standing alone, each of these might not support ordering restraints, they are nonetheless appropriate factors the court properly considered in the determination.

Rook also contends that the trial court erred by considering his consent to wear the Band-It because it was not constitutionally valid consent.  Rook asserts that he had a constitutional right not to wear the Band-It and the trial court could not extract a waiver of that right unless it met the constitutional standard of being a knowing, voluntary, and intelligent relinquishment of that right.  He argues that the trial court's failure to advise him that he had such a constitutional right invalidates any waiver of the right.

Rook's argument is misplaced. He cites no case law requiring such a waiver on the record, but simply analogizes to the waiver of other constitutional rights, such as the right to counsel and right to remain silent.  The right to be free from restraints in front of the jury is not such an absolute constitutional right requiring the waiver he desires. Rather, the trial court has the discretion to order restraints "when necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape," so long as they do not offend the constitutional rights to the presumption of

_____

[9] State v. Finch, 137 Wn.2d 792, 850, 975 P.2d 967 (1999).

innocence, to testify on one's own behalf and to confer with counsel during the course of a trial.[10] Here, the record does not indicate that the Band-It would have interfered with these rights as it was not visible to the jury and did not visibly restrict Rook's movement or ability to participate in the trial. Rather, the evidence presented was that the device would only be activated if Rook tried to escape or commit an assault, neither of which he attempted, and the record fails to show that it otherwise restricted his ability to physically move his body as he testified or conferred with counsel. Thus, Rook's agreement to wear the Band-It did not amount to an invalid waiver of his constitutional rights.

Even if Rook could show that the court's order amounted to an unconstitutional restraint, he fails to show prejudicial error warranting reversal. A claim of unconstitutional shackling is subject to harmless error analysis.[11] The error is harmless unless the defendant shows that "the shackling had substantial or injurious effect or influence on the jury's verdict."[12] A showing of such prejudice "requires evidence that the jury saw the restraints or that the restraints substantially impaired the defendant's ability to assist in his trial defense."[13]

Here, it is undisputed that the Band-It was not visible to the jury, and Rook does not point to any other tangible resulting prejudice. Rather, he simply asserts that it interfered with his mental faculties and constitutional right to defend himself and work with counsel. While he cites case law from other jurisdictions and law review articles

---

[10] Hartzog, 96 Wn.2d at 398.
[11] Damon, 144 Wn.2d at 692.
[12] State v. Hutchinson, 135 Wn.2d 863, 888, 959 P.2d 1061 (1998).
[13] State v. Monschke, 133 Wn. App. 313, 336, 135 P.3d 966 (2006), rev. denied, 159 Wn.2d 1010 (2007).

9

about the possible negative effects of stun belts, he offers no evidence in the record to support his claim. As in Monschke, where the court held that a defendant failed to establish prejudice from the court's decision that he wear a stun belt, Rook "offers only conclusory statements that the belt hampered his participation in his trial defense."[14] And, as the State points out, the record reveals in fact that the Band-It had little effect on his behavior as he continued to be obstreperous and disruptive even after being ordered to wear it.

Rook next contends that his sentence of life without parole violates the Eighth Amendment's proscription against cruel and unusual punishment and article I, section 14 of the Washington State Constitution's proscription against cruel punishment. The state constitutional proscription against "cruel punishment" affords greater protection than its federal counterpart.[15] Thus, if the state constitutional provision is not violated, neither is the federal provision.[16]

Washington courts recognize that article I, section 14 of the state constitution proscribes disproportionate sentencing.[17] In State v. Fain, the court set forth the following factors to be considered in determining whether a punishment is disproportionate to the crime committed: (1) the nature of the offense; (2) the legislative purpose behind the statute; (3) the punishment the defendant would have received in other jurisdictions; and (4) the punishment imposed for other offenses in the same

---

[14] 133 Wn. App. at 337.
[15] State v. Fain, 94 Wn.2d 387, 392-93, 617 P.2d 720 (1980).
[16] State v. Morin, 100 Wn. App. 25, 29, 995 P.2d 113 (2000).
[17] State v. Manussier, 129 Wn.2d 652, 676, 921 P.2d 473 (1996); Fain, 94 Wn.2d at 395-97.

jurisdiction.[18]

In a later case, State v. Manussier, the court narrowed the inquiry to three of these factors: (1) the nature of the offense; (2) the punishment received in other jurisdictions for the same offense; and (3) the punishment imposed for other offenses in the same jurisdiction.[19] The court also noted that as to the third factor, "There is no logical or practical basis for comparison of punishment appellant might receive for other crimes committed in Washington."[20] As the court explained:

> Sentences under the Sentencing Reform Act [of 1981, chapter 9.94A,] vary with each defendant's criminal history and the presence or absence of aggravating or mitigating factors. In appellant's case, however, even without reference to Initiative 593 [POAA], two of his three "most serious offenses" fall into a class of crimes with a maximum allowable sentence of life imprisonment. Under Initiative 593, appellant would receive a sentence of life imprisonment upon his conviction for any armed offense, any offense with a finding of sexual motivation, any class A felony, or any of the twenty-one offenses enumerated in RCW 9.94A.030(21)(a)-(u).[21]

Similarly here, two of Rook's three most serious offenses are class A felonies with a statutory maximum of life imprisonment. Thus, as in Manussier, this factor has little bearing on the proportionality analysis. Accordingly, our inquiry focuses on the remaining factors.

Rook contends that factor one, the seriousness of the offense, weighs heavily against application of the POAA in this case. He notes that vehicular assault is only a class B felony with a maximum penalty of 10 years in prison and/or a $20,000 fine. He also argues that the mental state ("rash or heedless manner, indifferent to the

---

[18] 94 Wn.2d 387, 397, 617 P.2d 720 (1980).
[19] 129 Wn.2d 652, 677, 921 P.2d 473 (1996). As to the second Fain factor, the legislative purpose of a life sentence under the POAA is well established. State v. Thorne, 129 Wn.2d 736, 771-72, 921 P.2d 514 (1996).
[20] 129 Wn.2d at 678.
[21] Manussier, 129 Wn.2d at 678 (footnotes omitted).

consequences") and degree of harm ("substantial bodily harm") required to commit this offense do "not warrant the imposition of the highest punishment possible short of the death penalty." He refers to the legislative purpose of the POAA and notes that when it was adopted, the vehicular assault statute required that the reckless driving result in "serious bodily injury," a higher degree of harm than is required in the current version of the statute.

The current version of the vehicular assault statute, RCW 46.61.522, as amended in 2001 provides:

> (1)    A person is guilty of vehicular assault if he or she operates or drives any vehicle:
>   (a) In a reckless manner and causes substantial bodily harm to another; or
>   (b) While under the influence of intoxicating liquor or any drug. . . [which] causes substantial bodily harm to another; or
>   (c) With disregard for the safety of others and causes substantial bodily harm to another.
> (2) Vehicular assault is a class B felony punishable under chapter 9A.20 RCW.
> (3) As used in this section, "substantial bodily harm" has the same meaning as in RCW 9A.04.110.

The former version of the statute read:

> (1)    A person is guilty of vehicular assault if he operates or drives any vehicle:
>   (a) In a reckless manner, and this conduct is the proximate cause of serious bodily injury to another; or
>   (b) While under the influence of intoxicating liquor or any drug. . . and this conduct is the proximate cause of serious bodily injury to another.
> (2) "Serious bodily injury" means bodily injury which involves a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any part or organ of the body.
> (3) Vehicular assault is a class B felony punishable under chapter 9A.20 RCW.

Rook contends that because this was the version in effect at the time the POAA

was adopted by the legislature, this was the conduct to which the POAA was intended to apply, not the current version that requires a lesser degree of injury thereby lessening the seriousness of the offense. Thus, he argues, to impose a life sentence for a less serious offense amounts to disproportionate punishment in violation of the state constitution. But such intent cannot be inferred from legislative inaction; rather, the intent to keep vehicular assault as it is currently defined on the list of serious offenses to which the POAA applies must be presumed absent any express intent to the contrary.[22]

In any event, as the State notes, Rook's conduct in fact satisfies the former statute's requirement that his driving caused serious bodily injury. The undisputed evidence established that Kalaluhi's injury was life *threatening*, as testified to by the attending physician, even though it ultimately resolved without emergency surgery. Additionally, the undisputed evidence established that he suffered permanent nerve damage in one of his arms. Thus, Rook fails to show that either the nature of the defense or the legislative purpose warrants a less severe penalty and is therefore disproportionate in violation of the constitutional prohibition against cruel punishment.

Finally, Rook contends that the remaining factor—comparison of punishments in other jurisdictions for similar offense—further demonstrates that imposing a life sentence for the vehicular assault he committed is grossly disproportionate to the crime. Based on a survey of other states' vehicular assault statutes, Rook contends that he would not have received this sentence in any other jurisdiction except Washington, noting that Washington's statute addresses significantly less serious conduct than other states' vehicular assault statutes by requiring a lower mental state and less serious

---

[22] See State v. Conte, 159 Wn.2d 797, 813, 154 P.3d 194 (2007) ("legislative intent cannot be gleaned from the failure to enact a measure").

resulting injury. The other statutes cited required either driving under the influence of intoxicants or serious bodily injury or both and in only one state is the offense a felony subject to recidivist sentencing.

But as the State contends, this is true only if the crimes considered are those specified as vehicular assault, not those that encompass the same conduct that formed the basis for Rook's conviction. For example, as the State points out, while North Carolina has no statute that would punish him similarly to Washington and has a statute for felony serious injury by vehicle requiring proof of intoxication, Rook's conduct meets the requirements for assault with a deadly weapon under North Carolina law, which is a "strike" offense under that state's violent habitual offender law.[23] Similarly, while reckless driving in California is only punishable up to 180 days in jail, Rook's conduct meets the requirements of assault with a deadly weapon under California law, a crime that would have made him eligible for an indeterminate life sentence under California's "three strikes" law.[24] Additionally, as the State points out, Rook fails to note that there are jurisdictions that subject offenders to potential life sentences under recidivist sentencing statutes for conduct that is less serious than Rook's.[25] Rook therefore fails

---

[23] See N.C. Gen. Stat. §§ 14-32, 14-7, 12; State v. Jones, 353 N.C. 159, 164-65, 538 S.E.2d 917 (2000) (holding that driver who operates motor vehicle in criminally negligent manner and causes serious injury is guilty of this crime). Criminal negligence in this context means a thoughtless disregard of consequences or a heedless indifference to the safety of others, which is very similar to the mental element of vehicular assault in Washington. Jones, 353 N.C. at 164-65.

[24] See Cal. Penal Code § 245, 667(e)(2)(A); People v. Wright, 100 Cal. App. 4th 703, 706, 123 Cal. Rptr. 2d 494, 497 (2002) (holding that "any operation of a vehicle by a person knowing facts that would lead a reasonable person to realize a battery will probably and directly result may be charged as an assault with a deadly weapon.")

[25] See Brief of Respondent at 29-30 (citing Indiana statute that includes as "third strike" offenses, selling drugs to minors or a third DUI conviction, and Nevada and Vermont statutes that subjects offender to a life sentence without parole after a fourth felony

to show that there are no other states in which he would be subjected to a similar penalty for this conduct. Accordingly, he has failed to demonstrate that imposition of a life sentence without parole for his conviction for vehicular assault, a third serious offense under the POAA, is grossly disproportionate in violation of the state and federal constitutions.

Rook further contends that his prior convictions must be found by a jury based on proof beyond a reasonable doubt and that the POAA violates the equal protection clause of the United States Constitution because offenders like himself who have three "strikes" are not entitled to a jury determination of their prior convictions. As the State notes, our courts have already considered and rejected these arguments and we are bound by those decisions.[26]

We also reject the claims Rook raises in a pro se statement of additional grounds for review. His challenge to the sufficiency of the evidence that he drove in a reckless manner fails, as determinations about the weight and credibility of the evidence are for the jury alone to make. While he argues that there was an alternative explanation for his driving, the jury was entitled to discount this evidence as not credible and we may not disturb the jury's factual determinations on appeal. Rook's claim of ineffective assistance of counsel also fails because Rook fails to show that counsel's conduct fell below an objective standard of reasonableness. The decision not to call Rectenwald as a witness was a legitimate trial tactic as her credibility was questionable, given that she

---

conviction).

[26] State v. Smith, 150 Wn.2d 135, 75 P.3d 934 (2003); State v. Thiefault, 160 Wn.2d 409, 418-20, 158 P.3d 580 (2007); State v. Langstead, 155 Wn. App. 448, 453-57, 228 P.3d 799, rev. denied, 170 Wn.2d 1009 (2010); State v. Salinas, 169 Wn. App. 210, 224-26, 279 P.3d 917 (2012).

had been drinking that night. Nor has Rook demonstrated that he was actually prejudiced by counsel's conduct as he testified to the facts to which he wanted Rectenwald to testify. We also reject Rook's claim that the trial court erred by failing to instruct the jury on the third alternate means of committing vehicular assault; such an instruction was not appropriate because he was not charged under that means and the charging decision is a matter of prosecutorial discretion. Finally, we reject Rook's contention that that the trial court was unfairly biased, reasserting the arguments above that the stun belt interfered with his ability to participate at trial. For the reasons discussed above, this claim is also without merit.

We accept the State's concession that remand is required to correct the judgment and sentence to reflect the jury's verdict and direct the trial court change the judgment and sentence to state that Rook committed the crime by means of reckless driving, not while under the influence of drugs or alcohol.[27] We affirm.

WE CONCUR:

---

[27] This court has denied Rook's motion to present additional evidence and further denies his subsequent motion for reconsideration and to present additional evidence in support of the motion for reconsideration.

16