# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  48072-7-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| THOMAS LOMAX, | |
| Appellant. | |

BJORGEN, C.J. — Thomas Lomax appeals his conviction and sentencing conditions for

first degree burglary.  He argues that the trial court erred by (1) improperly requiring him to wear

leg shackles, resulting in prejudicial error, and (2) preventing him from impeaching the State's

witness, Mariah McCarty, with her prior juvenile adjudications, which (a) was an abuse of

discretion under ER 609(d), and (b) violated his constitutional right to confront witnesses.

Lomax also argues that (3) the State committed prosecutorial misconduct when it vouched for

McCarty by stating in closing argument that "she's not making this up," and (4) even if each

claimed error on its own would not result in a reversal of his conviction, the cumulative

prejudice resulted in a fundamentally unfair trial.  Report of Proceedings (RP) at 428.  Lomax

further contends that the following sentencing errors occurred:  (5) the mandatory

deoxyribonucleic acid (DNA) fee of $100 violated his constitutional rights to (a) substantive due

process and (b) equal protection, (6) the sentencing court abused its discretion when it required

him to give a DNA sample, and (7) his judgment and sentence contained two scrivener's errors,

one for the wrong date of the crime and the other for the wrong term of punishment.  He also

objects to appellate costs and raises two additional arguments in his statement of additional grounds (SAG).

We hold that Lomax fails to demonstrate a prejudicial trial error warranting reversal of his conviction. We also hold that except for the scrivener's errors that need to be corrected, no sentencing error occurred. Finally, under newly amended RAP 14.2, Lomax may challenge costs on appeal before our commissioner if the State requests them. Accordingly, we affirm Lomax's conviction and sentence, but remand to the sentencing court to correct the scrivener's errors in the judgment and sentence.

## FACTS

### I. SEPTEMBER 20 INCIDENT

Donna Grow lives in the Hoquiam Castle with her grandson, Chris Adamson. Hoquiam Castle is a historic home with 20 rooms and 3 floors; Grow slept in the "Queen's room," located on the second floor. RP at 143. In the early morning of September 20, 2013, Grow was suddenly awakened by a stranger in the Queen's room. The stranger told her to stay in bed. Despite the stranger's order, she got out of bed, which prompted the stranger to strike her several times in the shoulder and face. Grow then activated an alarm, and the stranger fled Hoquiam Castle.

David Blundred and Shane Krohn, detectives with the Hoquiam Police Department, investigated, discovering that the Queen's room was in disarray and jewelry had been stolen. Atop a dresser in the Queen's room, they found a partly filled "Budweiser Light Straw-ber-Rita" can. RP at 244-45. Neither Grow nor Adamson drank Straw-ber-Rita and that kind of alcohol was not kept in Hoqiuam Castle.

Later in the investigation, police received a tip that Lomax was the individual who burgled Hoquiam Castle. The police interviewed Lomax, who denied any involvement with the burglary. They also obtained a buccal DNA swab from Lomax and sent the Straw-ber-Rita can, along with Lomax's buccal swab, to the Washington State Patrol Crime Laboratory Division for comparative DNA testing. Marion Clark, a forensic scientist with the lab, was able to develop a DNA profile from saliva discovered on the portion of the can where a person would drink. It was a match to Lomax's DNA profile with an estimated probability of approximately 1 in 7.5 quadrillion of selecting an unrelated individual at random from the United States' population.[1]

## II. PROCEDURE

Lomax was charged with first degree burglary. At trial, the facts above were brought out through the testimony of Grow, Adamson, Blundred, Krohn, and Clark. In addition, the following pertinent events occurred at trial.

1.      Mariah McCarty

McCarty, who was allegedly an accomplice to Lomax in the burglary, was a witness for the State. Despite being given transactional immunity, the State was only able to elicit from her that (1) she dropped off Lomax in front of Hoquiam Castle on some night in September 2013, (2) she fell asleep for several hours, and (3) when Lomax returned, he had jewelry. When the State attempted to gather more information from McCarty, she refused to testify, resulting in her being deemed a hostile witness and later being held in contempt of court.

---

[1] The lab also tested a buccal swab from another suspect, Dwight Warden, as well as Grow and Adamson. The DNA profile from the Straw-ber-Rita can did not match any of those individuals.

The day before McCarty was to testify, defense counsel moved the trial court to admit her three prior juvenile adjudications for taking a motor vehicle without permission to impeach her credibility. The trial court declined to make a ruling on the impeachment issue at that time, stating, "I will take a look at that issue and the cases interpreting that issue and provide you with a ruling." RP at 278. During McCarty's testimony the next day, defense counsel renewed his motion to impeach her "on priors," to which the court responded, "I'm not going to permit her to be impeached with juvenile convictions." RP at 385.

Although Lomax's defense counsel was not allowed to impeach McCarty with her prior juvenile adjudications, he was able to elicit the following from her during cross-examination:

| | |
|---|---|
| [Defense Counsel]: | You don't recall the day that you guys went to the Hoquiam Castle, do you? |
| [McCarty]: | No, sir. |
| [Defense Counsel]: | Were you using drugs on that—on that day? |
| [McCarty]: | Yes, sir. |
| [Defense Counsel]: | What drugs were you using? |
| [McCarty]: | Meth. Meth and heroin. |
| . . . . | |
| [Defense Counsel]: | Okay. You don't remember the day? |
| [McCarty]: | No, sir. |
| [Defense Counsel]: | And you were using drugs? |
| [McCarty]: | Yes, sir. |
| [Defense Counsel]: | And you, in fact, fell asleep? |
| [McCarty]: | Yes, sir. |

RP at 397-98.

No. 48072-7-II

2.    Shackles

After the State rested its case, the trial court required Lomax to wear leg shackles after

hearing from a correction's officer that he might run away if given the chance. Defense counsel

objected to the use of shackles, stating:

> Apparently Mr. Lomax, security told me that he was going to be shackled
> while we're finishing this trial. My concern is, I think from the jury's - proximity
> of the jury relationship to Mr. Lomax they can see under the table and see that his
> leg is shackled with chains. I'm going to ask that the Court not do that. I think that
> is going to represent a significant prejudice to him.

RP at 411. The court responded with the following ruling:

> All right. I was informed that Mr. Lomax had made statements to correction
> staff that given the opportunity to flee that he intended to do so and I felt that that
> was a sufficient security concern for Mr. Lomax to be shackled and I instructed the
> court administrator to tell the corrections officers that . . . I wanted Mr. Lomax to
> be shackled the remainder of the trial. I do not agree that . . . it's openly visible to
> the jury. From where the jury is sitting there's a panel on the table that blocks view
> of Mr. Lomax. The shackles are down around his ankles very - I can barely see
> them from here and I have a direct view of Mr. Lomax.
> If you are concerned about it you can have him sit on the other side of Mr.
> Ehrhardt where the jury clearly would not be able to see his feet. So if you're
> concerned about the jury seeing the shackles have Mr. Lomax move to the left of
> Mr. Ehrhardt. But otherwise, I believe that there is a sufficient security concern for
> Mr. Lomax to be shackled for the remainder of this trial.

RP at 411-12. After defense counsel talked with his co-counsel about whether to move Lomax,

the defense stated that "he's going to stay." RP at 412.

3.    Closing Argument

During its closing argument, the State addressed the trustworthiness of McCarty's

testimony:

> She was put on the stand, didn't want to testify given immunity so she couldn't be
> prosecuted and she still wouldn't . . . tell you everything, but she did tell you
> enough. She did tell you enough. And *she's not making this up*, because if she
> were, well, she could say, oh, yeah, that's exactly the place.

5

No. 48072-7-II

RP at 427-28 (emphasis added).

4.      Verdict/Sentencing

The jury found Lomax guilty of first degree burglary.  At sentencing, the court imposed a mandatory sentence of life without the possibility of release because Lomax met the definition of a persistent offender.  RCW 9.94A.570.  In addition, the trial court imposed a mandatory $100 DNA fee, required Lomax to provide his DNA sample, and signed the judgment and sentence with the date of the offense listed as "9/20/2014" and the maximum term for that offense as "25 years to life and/or a $50,000 fine."  Clerk's Papers (CP) at 12-16.

Lomax appeals.

ANALYSIS

I. SHACKLES

Lomax argues that the trial court's ordering of leg shackles toward the end of his trial was a presumptively prejudicial error requiring reversal of his conviction.  Although we agree that the use of shackles was an abuse of discretion, Lomax fails to show prejudice, i.e. that the shackling had a substantial or injurious effect or influence on the jury's verdict.  In the absence of that showing, the use of shackles does not warrant reversal.  *See In re Davis*, 152 Wn.2d 647, 694, 101 P.3d 1 (2004).

1.    <u>Imposition of Shackles</u>

"'We review the trial court's decision to shackle a defendant under an abuse of discretion standard.'" *State v. Turner*, 143 Wn.2d 715, 724, 23 P.3d 499 (2001) (quoting *State v. Breedlove*, 79 Wn. App. 101, 113, 900 P.2d 586 (1995)). "'Discretion is abused when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons.'" *Id.* (quoting *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993)).

A defendant is entitled to appear at trial free from shackles except in extraordinary circumstances. *State v. Finch*, 137 Wn.2d 792, 842, 975 P.2d 967 (1999). Several reasons implore this rule—the sight of a shackled defendant may suggest he is a dangerous and untrustworthy person, may violate his presumption of innocence, restrict his ability to assist counsel, interfere with the right to testify in his own behalf, or deprive him of the full use of his faculties. *State v. Damon*, 144 Wn.2d 686, 690-91, 25 P.3d 418 (2001).

The trial court has broad discretion to determine what security measures are necessary to maintain decorum in the courtroom and to protect the safety of its occupants. *Id.* at 691. Generally, shackles should "'be used only when necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape.'" *Id.* (quoting *State v. Hartzog*, 96 Wn.2d 383, 398, 635 P.2d 694 (1981)). In determining whether the use of shackles is justified, the trial court may consider the following factors:

> "The seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and the mood of the audience; the nature and

physical security of the courtroom; and the adequacy and availability of alternative remedies."

*Id.* (quoting *Finch*, 137 Wn.2d at 848) (alteration marks omitted).

The trial court must make its decision based on facts set forth in the record, *Hartzog*, 96 Wn.2d at 400, and should allow the use of shackles only after conducting a hearing and entering findings into the record that are sufficient to justify the use of the shackles. *Damon*, 144 Wn.2d at 691-92. Importantly, because shackles and other forms of restraint are a measure of "last resort," the trial court "*must* consider less restrictive alternatives before imposing physical restraints," *Finch*, 137 Wn.2d at 850 (emphasis added), such as the use of additional security personnel, metal detectors, or other security devices. *Hartzog*, 96 Wn.2d at 401.

Here, after defense counsel objected to the use of shackles, the trial court responded that Lomax had suggested he would flee if given the opportunity to do so. On that basis,[2] the trial court required Lomax to be shackled for the remainder of the trial. The trial court, however, made no attempt to examine whether less restrictive alternatives to leg shackles may have addressed Lomax's escape risk.

In *State v. Afeworki*, 189 Wn. App. 327, 355, 358 P.3d 1186 (2015), *review denied*, 184 Wn.2d 1036 (2016), Division One of our court upheld the trial court's decision to impose shackles on a defendant, noting:

---

[2] The State also argues that because Lomax was facing a mandatory life sentence that the trial court did not abuse its discretion in imposing the shackles. But nothing in the record indicates that the trial court considered Lomax's potential punishment in determining whether to impose shackles on him. We cannot make this assumption when a trial court may only impose shackles "after a hearing with a record *evidencing the reasons for the action taken*." *Hartzog*, 96 Wn.2d at 401 (emphasis added). Here, the record indicates that the trial court imposed shackles on the sole basis that Lomax was an escape risk.

> [A]s required, the court considered alternative security measures. For example, the court rejected the use of more restrictive physical restraints. . . . Moreover, as noted, the court ordered other security measures that would work in concert with the [restraint].

With nothing in the record or findings showing that the trial court considered whether additional security guards, for example, may have adequately reduced Lomax's potential escape risk, we cannot say the trial court was justified in imposing the leg shackles. Thus, we hold that the trial court abused its discretion in imposing shackles because it failed to consider less restrictive alternatives.[3]

## 2.    Prejudice

Because the trial court abused its discretion when it ordered Lomax to wear shackles, we next examine whether he has shown prejudice. *See Davis*, 152 Wn.2d at 694. Prejudice is shown if the defendant demonstrates that the shackling "'had substantial or injurious effect or influence on the jury's verdict.'" *Id.* (quoting *State v. Hutchinson*, 135 Wn.2d 863, 888, 959 P.2d 1061 (1998)). To meet this burden, the defendant must show that, based on the record, the jury could observe the shackles or that the shackles substantially impaired the defendant's ability to assist in his trial defense. *State v. Monschke*, 133 Wn. App. 313, 336, 135 P.3d 566 (2006) (citing *Finch*, 137 Wn.2d at 845). Only if prejudice is shown from the defendant wearing shackles does the burden shift to the State to prove that the use of restraints was harmless beyond a reasonable doubt. *See Davis*, 152 Wn.2d at 694.

---

[3] In addition, Lomax argues that the trial court abused its discretion because it deferred to the judgment of correctional officers. A trial court cannot base its decision solely on a correctional officer's recommendation that shackles should be imposed. *Finch*, 137 Wn.2d at 853; *Damon*, 144 Wn.2d at 692. However, finding that the trial court clearly did not consider less restrictive alternatives, we decline to examine the merits of this alleged error.

*Damon*, 144 Wn.2d 686 and *State v. Flieger*, 91 Wn. App. 236, 955 P.2d 872 (1998) involve situations where the defendant met his initial burden to prove that the use of restraints had a substantial or injurious effect or influence on the jury's verdict. In *Damon*, the defendant was required to use a restraint chair that had straps across both his shoulders, down and across his waist, and his legs were strapped and manacled. *Id.* at 693. The *Damon* court held that the jurors must have observed that he was in a restraint chair and could have inferred that he was a dangerous individual. *Id.* Similarly, in *Flieger,* 91 Wn. App. at 238-39, the defendant was required to wear a shock box, and the record reflected that jurors noticed the shock box and discussed why the defendant had to wear it. The court held that because the jurors were aware of the shock box and were speculating about it, they could have inferred that the defendant was a dangerous person who could not be trusted or controlled. *Id.* at 242.

Here, Lomax does not show that the jury was aware he was wearing leg shackles or that he was otherwise prejudiced from having to wear them. After defense counsel argued that the jury could see the leg shackles under the table, the trial court disagreed that the shackles were "openly visible to the jury." RP at 412. The trial court observed that "[f]rom where the jury is sitting there's a panel on the table that blocks view of Mr. Lomax. The shackles are down around his ankles. . . . I can barely see them from here and I have a direct view of Mr. Lomax." RP at 412. At best, the record reflects that defense counsel and the trial court disputed whether the jurors in fact could see the shackles from their point of view. Unlike *Damon* and *Flieger*, where the record clearly indicated that jurors could observe the defendant in shackles, the conflicting observations of defense counsel and the trial court do not establish that the jurors

10

could see Lomax wearing shackles. Thus, Lomax fails to carry the burden to show that the jury observed the shackles and was subject to some prejudice therefrom.

Lomax argues, though, that if we only measure prejudice based on whether the jury could observe his shackles, it would "ignore[] the actual effect and prejudice caused by restraint," such as his ability to assist in his defense. Br. of Appellant at 13 (citing *Riggins v. Nevada*, 504 U.S. 127, 137, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992)). Lomax suggests that the "prejudice analysis [is] far more searching than simply determining whether the restraint was visible." Br. of Appellant at 14.

In *Riggins*, 504 U.S. at 137, the Court rejected the proposition that the defendant had to demonstrate actual prejudice from the record because it was nearly impossible, beyond speculation, to show how the trial would have proceeded differently if the defendant had not been on Mellaril, a psychotropic drug. Although it was nearly impossible to show prejudice, the defendant in *Riggins* had evidentiary support that Mellaril could substantially impair his ability to assist in his trial defense. *Id.* The record provided that the amount of Mellaril administered to Riggins had the potential to impair his cognitive abilities during trial. *Id.* Thus, *Riggins* does not undermine Lomax's burden to show prejudice by providing evidence of the prejudicial effect of the shackles. *Monschke*, 133 Wn. App. at 336.

In *State v. Walker*, 185 Wn. App. 790, 802-03, 344 P.3d 227, *review denied*, 183 Wn.2d 1025 (2015), the court found no prejudice could be presumed based on shackling when the defendant failed to point to any evidence that the shackles impaired his ability to assist with his defense. In *Monschke*, 133 Wn. App. at 337, the court held that the defendant failed to show that a stun belt underneath the defendant's clothes hampered his ability to participate in his defense

when he only offered "conclusory statements" to support his claim. Like *Walker* and *Monschke*, we have no evidentiary basis on which to find Lomax's ability to assist with his trial was undermined.

Lomax also argues that *Illinois v. Allen*, 397 U.S. 337, 90 S. Ct. 1057, 25 L. Ed. 2d 253 (1970) and *Estelle v. Williams*, 425 U.S. 501, 504, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976), both cited in *Riggins*, require us to presume his leg shackles prejudiced his ability to assist in his defense. In those two cases, where one defendant was forced to wear prison clothing, *Estelle*, 425 U.S. at 504, and the other bound and gagged for his trial, *Allen*, 397 U.S. at 344, the courts found prejudice because of the obvious consequences from the jury observing the defendant. Further, in *Allen*, 397 U.S. at 344, the defendant, who was in a condition of total physical restraint from the gag and bounds, was prejudiced because he was unable to assist at his trial.

*Estelle* and *Allen* dictate the same prejudice standard that *Riggins*, *Damon*, *Flieger*, *Walker*, and *Monschke* command: that Lomax must show, based on the record, that the jury could observe the shackles or that the shackles substantially impaired his ability to assist in his trial defense. Prison clothing and the use of bindings and a gag carry an inherent imprimatur of prejudice. But where a defendant is only restrained by the use of leg shackles, he must demonstrate that they were either observed or that the shackles somehow impaired his ability to participate in the trial.

Lomax fails to show that the jury observed his leg shackles or that the shackles otherwise compromised his defense. Thus, even though the trial court abused its discretion in requiring Lomax to wear the shackles, he fails to show prejudice, i.e. that "the shackling 'had substantial or injurious effect or influence on the jury's verdict.'" *Davis*, 152 Wn.2d at 694 (quoting

No. 48072-7-II

*Hutchinson*, 135 Wn.2d at 888). Because Lomax fails to meet his burden in showing prejudice,

we need not reach the issue of whether the State has demonstrated that the use of shackles was

harmless beyond a reasonable doubt. *See Id.* Accordingly, Lomax's shackling claim fails.

## II. IMPEACHMENT OF MCCARTY

Lomax argues that by not allowing him to impeach McCarty with her three prior juvenile

adjudications for taking a motor vehicle without permission, the trial court (1) abused its

discretion and (2) violated his constitutional right to confront witnesses. For the reasons below,

we disagree.

1. ER 609(d)

We review rulings under ER 609 for an abuse of discretion. *State v. Rivers*, 129 Wn.2d

697, 704-05, 921 P.2d 495 (1996). ER 609(d), which governs the admissibility of prior juvenile

adjudications, states:

> Evidence of juvenile adjudications is generally not admissible under this rule. The court may, however, in a criminal case allow evidence of a finding of guilt in a juvenile offense proceeding of a witness other than the accused [1] if conviction of the offense would be admissible to attack the credibility of an adult and [2] the court is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence.

Taking a motor vehicle without permission qualifies as a crime of dishonesty, making it

normally admissible against a witness under ER 609(a)(2).[4] *State v. Trepanier*, 71 Wn. App.

372, 381, 858 P.2d 511 (1993). Thus, the first prong of the ER 609(d) test is met.

---

[4] "For the purpose of attacking the credibility of a witness in a criminal or civil case, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during examination of the witness but only if the crime . . . involved dishonesty or false statement, regardless of the punishment." ER 609(a)(2).

13

The second prong of ER 609(d) required Lomax to make a "positive showing" that the admission of McCarty's taking of motor vehicle adjudications was necessary for a fair determination of the issue of guilt or innocence. *State v. Gerard*, 36 Wn. App. 7, 12, 671 P.2d 286 (1983). "In the absence of any indication of special reasons favoring admissibility, the general rule is that the adjudications are inadmissible." *Id.* If the juvenile adjudications are offered simply to impeach a witness, the defendant does not meet his burden in showing that the evidence was necessary for a fair determination of guilt. *See Id.*

Defense counsel only offered McCarty's three juvenile adjudications for purposes of impeachment. Counsel moved the court to admit them only to attack her credibility and did not offer any additional reasons beyond the general statement that "they're relevant given the weight her testimony has." RP at 278.

On this record, defense counsel failed to make a showing that there was any reason, other than a general attack on her credibility, that admitting the three prior juvenile adjudications was necessary to determine Lomax's innocence or guilt. Under *Gerard*, 36 Wn. App. at 12, the burden was on Lomax to present reasons other than impeachment to demonstrate that the evidence was necessary for a fair determination. A general statement that a witness's credibility is relevant given the weight of her testimony does not sufficiently articulate why those adjudications are "necessary for a fair determination of the issue of guilt or innocence." ER 609(d).

Lomax argues that without the prior juvenile adjudications, "the jury could not properly assess Ms. McCarty's honesty as a witness. . . . Lomax did not have other evidence from which to argue Ms. McCarty may not have been a truthful witness." Br. of Appellant at 17. Defense

14

counsel, however, was able to attack McCarty's veracity in a similar fashion as the prior adjudications would have. Defense counsel was able to elicit that she was on methamphetamine and heroin and had forgotten what happened on the day that she dropped off Lomax. This, coupled with the fact that McCarty was a hostile witness and would hardly answer the State's questions, presented reasons to question her credibility to the jury. For these reasons, the prior juvenile adjudications were not essential to evaluating McCarty's veracity.

Accordingly, the trial court did not abuse its discretion in denying Lomax's ER 609(d) motion.

2.      Right to Confrontation

Next, Lomax argues that his confrontation clause rights were violated because of the trial court's refusal to admit the prior juvenile adjudications against McCarty. We disagree.

Lomax did not raise a confrontation clause challenge below. Under RAP 2.5(a),[5] we "may refuse to review any claim of error which was not raised in the trial court." However, a party may raise for the first time on appeal a "manifest error affecting a constitutional right." RAP 2.5(a)(3). Because the right of confrontation is of constitutional magnitude, Lomax only needs to show that the alleged error was "manifest" in order for us to reach it. RAP 2.5(a)(3); *see also State v. Hart*, 195 Wn. App. 449, 460, 381 P.3d 142 (2016), *review denied*, 187 Wn.2d 1011 (2017). To show an error was "manifest," one must show "actual prejudice." *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009), *as corrected* (Jan. 21, 2010). To demonstrate

---

[5] We view RAP 2.5 as a procedural rule governing when challenges under the confrontation clause may be raised consistent with *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 313-14 n.3, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009).

actual prejudice, one must make a plausible showing that the asserted error had practical and identifiable consequences in the trial of the case. *Id.*

In order to determine whether Lomax has demonstrated a "manifest" confrontational clause error, we review the general standards governing a confrontation clause challenge. A confrontation clause challenge is reviewed de novo. *State v. Jasper*, 174 Wn.2d 96, 108, 271 P.3d 876 (2012). Under the sixth amendment to the United States Constitution and article 1, section 22 of the Washington Constitution, a defendant possesses the right to confront and cross-examine adverse witnesses. *State v. Barnes*, 54 Wn. App. 536, 538, 774 P.2d 547 (1989); *State v. Hudlow*, 99 Wn.2d 1, 14-15, 659 P.2d 514 (1983). However, this right is not absolute. *State v. Darden*, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002). Courts may, within their discretion, deny cross-examination if the evidence sought is vague, argumentative, or speculative. *Id.* at 620-21. Thus, the confrontation right is subject to the following test:

> First, the evidence must be of at least minimal relevance. Second, if relevant, the burden is on the State to show the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at trial. Finally, the State's interest to exclude prejudicial evidence must be balanced against the defendant's need for the information sought, and only if the State's interest outweighs the defendant's need can otherwise relevant information be withheld.

*Id.* at 622.

McCarty's prior juvenile adjudications for taking a motor vehicle without permission were at least relevant to impeach her veracity. However, our prior cases have established that the

16

State has a compelling interest "in insuring that witnesses are not discouraged from coming forward with evidence of a crime out of fear of having a prior conviction brought forward." *State v. Martinez*, 38 Wn. App. 421, 424, 685 P.2d 650 (1984); *accord Barnes*, 54 Wn. App. at 539. We must, then, determine whether the State's interest in excluding the prejudicial evidence outweighed Lomax's need to admit the prior juvenile adjudications.

In weighing these two interests, the State's interest will prevail if the defendant has the opportunity to impeach the State's witness in a similar way. In *Barnes*, 54 Wn. App. at 539, the court held that the defendant's interest did not outweigh the State's need to exclude a prior conviction for the reason that "the impeachment through use of the prior conviction was minimal because . . . there was other evidence of a sufficient quantity before the jury to impeach Mr. Redmond." Similarly, in *Martinez*, 38 Wn. App. at 424-25, the court reasoned that "Martinez's interest in impeaching the victim with his prior conviction is minimal . . . because there was already abundant evidence impeaching him" and thus held that the defendant's right to confrontation was not violated.

McCarty was a key witness for the State's case because her testimony corroborated the DNA evidence. Thus, impeachment of that testimony was crucial to creating a reasonable doubt in the jury's minds. As discussed earlier, however, defense counsel was able to impeach McCarty's credibility during cross-examination by bringing out that she was on methamphetamine and heroin and did not remember what happened on the day of the burglary. In the same fashion as *Barnes* and *Martinez*, the admission of McCarty's three prior juvenile adjudications would have minimally, if at all, further impeached the crumbling veracity of McCarty's testimony. The State's interest in protecting its witness outweighed Lomax's little

17

need to admit the prior juvenile adjudications, and he fails to show a confrontation clause violation.

Because no confrontation clause violation occurred, Lomax fails to show that he suffered from actual prejudice with practical and identifiable consequences. *O'Hara*, 167 Wn.2d at 99. Accordingly, we deem this alleged error waived because it was not manifest. RAP 2.5(a)(3).

### III. PROSECUTORIAL MISCONDUCT

Lomax argues that the State improperly vouched for McCarty when the prosecutor stated in closing argument that "she's not making this up." Br. of Appellant at 23-26.

To establish prosecutorial misconduct, the defendant must prove that the prosecuting attorney's remarks were both improper and prejudicial. *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). "In analyzing prejudice, we do not look at the comments in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury." *State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008).

If the defendant did not object to the alleged misconduct, he is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

It is improper for a prosecutor to vouch for a witness's credibility. *State v. Lewis*, 156 Wn. App. 230, 240, 233 P.3d 891 (2010). Lomax contends that the State improperly vouched for

McCarty when it stated that "she's not making this up." RP at 428. Assuming without deciding that this remark was improper, Lomax's challenge to it was waived. If Lomax had objected, a curative jury instruction could have obviated any prejudice from the State's single remark. Thus, Lomax's prosecutorial misconduct claim fails.

## IV. PREJUDICE/CUMULATIVE ERROR

Lomax argues that even if we believe that each error alone—the imposition of shackles, the restriction on Lomax from impeaching McCarty with prior juvenile adjudications, and the prosecutor's improper vouching—would not result in an unfair trial, in the aggregate, they do.

"Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *Emery*, 174 Wn.2d at 766. As determined in Part I and II above, we found that Lomax failed to demonstrate prejudice from making him wear leg shackles, and that the trial court did not abuse its discretion or violate his confrontation right by preventing him from impeaching McCarty with her prior adjudications. Thus, no prejudice from these errors can contribute to a cumulative prejudice calculus. We are left only with the prejudice from the assumed improper vouching, which we deemed waived in Part III because the remark could have easily been remedied with a curative instruction. Accordingly, the cumulative error claim fails.

## V. MANDATORY DNA FEE

Lomax argues that the mandatory $100 DNA fee assessed under RCW 43.43.7541[6] violated his constitutional rights to substantive due process and equal protection. We disagree.

---

[6] RCW 43.43.7541 was amended in 2015. This amendment does not affect our disposition of this case.

RCW 43.43.7541 requires every defendant to pay a $100 DNA fee when subjected to a sentence for any felony conviction or other specified misdemeanors and juvenile equivalents listed under RCW 43.43.754(1)(a).[7] In *State v. Mathers*, 193 Wn. App. 913, 926, 928-29, 376 P.3d 1163, *review denied*, 186 Wn.2d 1015 (2016), our court held that the mandatory $100 DNA fee did not violate Mathers' rights to substantive due process or equal protection.

In Lomax's opening briefing, he acknowledges *Mathers* is contrary to his position, but states that "[i]n anticipation of a Motion for Reconsideration [on *Mathers*], I am leaving my version of these issues unchanged." Br. of Appellant at 27 n.5. No reconsideration motion was ever submitted, and Mathers' petition for review to the Supreme Court was denied. *State v. Mathers*, 186 Wn.2d 1015, 380 P.3d 482 (2016). After the date the petition for review was denied, Lomax stated in his reply brief that all three divisions of the Court of Appeals,[8] which includes our opinion in *Mathers*, resolve "the issue contrary to the position taken by Lomax" and does not ask us to consider his arguments again. Reply Br. of Appellant at 4. Because Lomax essentially concedes his argument is futile and does not invite the court to readdress his arguments, we simply follow *Mathers* and decline to further address any substantive due process and equal protection challenges to the $100 DNA fee.

---

[7] RCW 43.43.754 was amended in 2015. This amendment does not affect our disposition of this case.

[8] In his reply brief, Lomax acknowledges that every division of the Court of Appeals has issued opinions contrary to his position. Reply Br. of Appellant at 4 (citing *e.g. Mathers*, 193 Wn. App. at 927-28; *State v. Shelton*, 194 Wn. App. 660, 663, 378 P.3d 230 (2016), *review denied*, 187 Wn.2d 1002 (2017); *State v. Stoddard*, 192 Wn. App. 222, 224, 366 P.3d 474 (2016)). We note that our division's opinion in *Mathers* holds that the $100 mandatory DNA fee did not violate Mathers' rights to substantive due process or equal protection. Neither *Shelton* from Division One nor *Stoddard* from Division Three addresses an equal protection challenge.

## VI. DNA SAMPLE

Lomax argues that the sentencing court abused its discretion by ordering him to submit another DNA sample despite the fact that he had already given one. We disagree.

"A biological sample must be collected for purposes of DNA identification analysis from . . . [e]very adult or juvenile individual convicted of a felony." RCW 43.43.754(1)(a). However, "[i]f the Washington state patrol crime laboratory already has a DNA sample from an individual for a qualifying offense, a subsequent submission is not required to be submitted." RCW 43.43.754(2).

In *State v. Lewis*, 194 Wn. App. 709, 720, 379 P.3d 129, *review denied*, 186 Wn.2d 1025 (2016), Lewis claimed that the trial court erred by ordering him to submit another DNA sample. To support his argument, Lewis attached his judgment and sentence that lists his criminal history from 1995-2004, which was riddled with felony convictions. *Id.* at 720-21. However, the court declined to address his challenge because

> [n]othing in the record shows that Lewis actually submitted a DNA sample or that the Washington State Patrol Crime Laboratory already has a DNA sample for a qualifying offense. Because Lewis makes no showing that RCW 43.43.754(2) applies, the record does not support his argument that the court erred by ordering him to submit a DNA sample for testing.

*Id.* at 721 (citation omitted).

Similarly to *Lewis*, Lomax relies on his prior judgment and sentences and argues that we can infer that his DNA sample has already been taken because of his uncontested criminal history between 1999 and 2013 for numerous felonies when the mandatory DNA collection law was effective. As in *Lewis*, we hold that despite Lomax's circumstantial evidence, he fails to

show that a DNA sample has already been submitted for one of his prior offenses. Accordingly, this claim fails.

## VII. SCRIVENER'S ERRORS

Lomax argues that we should remand his case to the sentencing court to correct two scrivener's errors on his judgment and sentence: one for the wrong date of the crime and the other for the wrong term of punishment. The State concedes that we should remand to correct the wrong date, but does not address the wrong term of punishment. We accept the State's concession to correct the date, as well as order the sentencing court to correct the maximum term of punishment.

We are empowered to remand a case to correct a judgment and sentence, even if no prejudice is demonstrated from the scrivener's error. *See State v. Moten*, 95 Wn. App. 927, 929, 976 P.2d 1286 (1999). Lomax's judgment and sentence states he committed a burglary on September 20, 2014, but he was convicted for a September 20, 2013 offense. Further, his judgment and sentence lists that the maximum term he will serve is 25 years to life for his first degree burglary conviction. Under RCW 9A.20.021[9] the maximum term of punishment for a class A felony, such as first degree burglary, RCW 9A.52.020, is life imprisonment—not 25 years to life.[10]

---

[9] RCW 9A.20.021 was amended in 2015. This amendment does not affect our disposition of this case.

[10] In his briefing, Lomax cites to RCW 9.94A.570, part of the Sentencing Reform Act of 1981 (SRA), as the source for correcting the maximum term. However, the error as to the term was in the box with information as to the count itself, not the SRA sentence.

Accordingly, we remand this case to the sentencing court to correct these scrivener's errors by changing the date of the offense to September 20, 2013 and changing the maximum term of punishment to life imprisonment.

## VIII. APPELLATE COSTS

Lomax asks that we exercise our discretion to deny any appellate costs the State requests. The State objects to our consideration of appellate costs at this time, noting that it has not yet decided whether to request costs.

Under the newly revised provisions of RAP 14.2, a commissioner of this court will determine whether to award appellate costs if the State decides to file a cost bill and if Lomax objects to that cost bill.

## IX. SAG

In his SAG, Lomax argues that (1) juror number 25 had a conflict of interest that prejudiced his trial and (2) the trial court abused its discretion in denying his counsel's requests for a mistrial. For the reasons below, we disagree.

1.      Juror Number 25

Lomax argues that he was prejudiced by the presence of juror 25, a "court clerk" in the Grays Harbor County Courthouse, because she had a "major conflict of interest" in that she knew the judge, prosecutor, and defense attorney involved in the case. SAG, Att. 1. Indeed, the voir dire process brought out that juror 25 knew the judge, prosecutor, and defense attorney in her role as court clerk. After that, she was questioned whether there was "any reason that [she] would not be comfortable being a juror in this case or any reason that would make it difficult for [her] to be fair and impartial to both sides," to which she responded in the negative. RP at 52.

23

On this record, Lomax fails to show that juror 25 had a conflict of interest due to her relationship with the judge or attorneys.

Lomax also claims that juror 25 had a conflict of interest because she witnessed him dressed in a jump suit and in shackles as he moved in and out of the courthouse. We have nothing in the record, though, to indicate that juror 25 actually observed Lomax in this capacity. Lomax may raise this issue again in a personal restraint petition (PRP), where he can supplement the record to support his argument. *See State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995).

Lomax also contends that he told his defense counsel to remove juror 25 from his case, but his attorney declined to do so. Lomax's unsworn statements in his SAG cannot supplement the record before us. Again, he may raise this issue again in a PRP, where he can properly supplement the record. *Id.*

Accordingly, the claims related to juror 25 fail.

2.      Mistrial

Lomax argues that the trial court abused its discretion in denying his requests for a mistrial after the State elicited from its witnesses, Blundred and Krohn, that they received anonymous tips that Lomax was involved in the burglary.

We apply the abuse of discretion standard in reviewing a trial court's denial of a motion for mistrial. *State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989). We will find abuse only if no reasonable judge would have reached the same conclusion. *Id.*

The trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly. *Id.* In

determining whether a trial court abused its discretion, we gauge the effect of an irregularity by examining (1) its seriousness, (2) whether it involved cumulative evidence, and (3) whether the trial court properly instructed the jury to disregard it. *Id.*

The first motion for a mistrial occurred during Blundred's direct examination, where it was brought out that Lomax's name came up after Krohn received "tips" during the investigation. RP at 251-52. In commenting on his interview with Lomax, Blundred stated, "[Lomax] denied any involvement, denied any knowledge. *When asked about why his name would be brought up in this time* [sic] *of a situation*." RP at 252 (emphasis added). Before Blundred could continue, defense counsel objected, and the prosecutor agreed to move on from this line of questioning. After Blundred's testimony finished, defense counsel moved for a mistrial, stating that the tip evidence was a "bell that I don't think we can unring with a jury instruction or . . . curative comment." RP at 272. The trial court denied the motion, stating:

> [I]t may have been a bell, but it wasn't a very loud bell, it was more like a tinkle. I agree there was a reference to a tip. There was no objection at the time, no motion to strike. I would entertain a motion right now to give the jury a curative instruction and ask to disregard that testimony and strike testimony from Detective Blundred regarding the fact that he contacted Mr. Lomax in response to a tip he had received.

RP at 272. Defense counsel declined the court's offer for a curative instruction.

The second motion for a mistrial occurred later in Krohn's direct, where in referencing his interview with Lomax, he stated that he challenged Lomax's denial of the offense by "ask[ing] him why somebody would say that." RP at 318. This statement received an immediate objection from defense counsel, which was overruled. Krohn's testimony continued, in which he stated that he "asked [Lomax] *why somebody would claim that he was the one*," which again received an objection. RP at 318 (emphasis added). At this time, the trial court admonished the

25

State, saying that it could not introduce inadmissible hearsay and that Krohn's statements "tell[]

the jury that someone who Mr. Lomax is not able to confront at this trial accused him of

committing the crime." RP at 318-20. Defense counsel, again, moved for a mistrial, which the

trial court denied. The trial court, however, stated it would instruct the jury to disregard Krohn's

last comment, which defense counsel agreed was a sufficient remedy.

On this record, the trial court's denial of the motions for mistrial was not an abuse of

discretion. In both instances, the trial court examined the possible prejudice inflicted on Lomax

from Blundred and Krohn's remarks. It also provided a reasonable solution to those problems.

In the first instance, it offered the defense a curative instruction, which Lomax declined. In the

second instance, the trial court instructed the jury to disregard Krohn's problematic comments,

which defense counsel agreed was an appropriate remedy. Given the nature of the errors

presented, we hold that the trial court appropriately exercised its discretion in these instances and

thus Lomax's claims fail.

## CONCLUSION

We hold that Lomax fails to demonstrate a prejudicial trial error. We also hold that no

sentencing error occurred except for the two scrivener's errors. Accordingly, we affirm Lomax's

conviction and sentencing conditions, but remand for the sentencing court to correct the

No. 48072-7-II

scrivener's errors as directed.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

BJORGEN, C.J.

We concur:

LEE, J.

MELNICK, J.